No. 23-1802

IN THE

# United States Court of Appeals
## for the First Circuit

UNITED STATES; STATE OF ARIZONA; STATE OF CALIFORNIA; DISTRICT OF
COLUMBIA; STATE OF FLORIDA; COMMONWEALTH OF MASSACHUSETTS;
COMMONWEALTH OF PENNSYLVANIA; COMMONWEALTH OF VIRGINIA,

*Plaintiffs-Appellees*,

v.

AMERICAN AIRLINES GROUP INC.,

*Defendant-Appellant*,

JETBLUE AIRWAYS CORPORATION,

*Defendant.*

On Appeal from the United States District Court for the District of
Massachusetts, No. 1:21-cv-11558 (Hon. Leo T. Sorokin)

## BRIEF FOR PLAINTIFFS-APPELLEES

JONATHAN S. KANTER
  *Assistant Attorney General*
DOHA G. MEKKI
  *Principal Deputy Assistant
  Attorney General*
HETAL J. DOSHI
  *Deputy Assistant Attorney
  General*
MICHAEL B. KADES
  *Deputy Assistant Attorney
  General*
DAVID B. LAWRENCE
  *Policy Director*
MARKUS A. BRAZILL
  *Counsel to the Assistant
  Attorney General*
WILLIAM H. JONES II
  *Counsel to the Director of Civil
  Litigation*

PATRICIA C. CORCORAN
JAMES H. CONGDON
SCOTT L. REITER
JOHN J. SULLIVAN

DANIEL E. HAAR
NICKOLAI G. LEVIN
MATTHEW A. WARING
ALICE A. WANG
  *Attorneys*
U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave., N.W.
Room 3224
Washington, D.C. 20530-0001
(202) 532-4186
matthew.waring@usdoj.gov

(additional counsel listed in signature block)

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES......................................................................iv

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ...............xi

INTRODUCTION......................................................................................1

JURISDICTIONAL STATEMENT ..........................................................4

STATEMENT OF THE ISSUES................................................................5

STATEMENT OF THE CASE ..................................................................6

    A.  Defendants Are Major Competitors with Dominant Market
        Shares on Numerous Routes in the Northeast. ..........................6

    B.  Before the NEA, Defendants Competed Vigorously on Northeast
        Routes—and Consumers Benefited. .............................................8

    C.  Instead of Continuing to Compete, Defendants Formed
        the NEA.............................................................................................9

        1.  Defendants Acted Like One Airline in the Northeast. .............10

        2.  The NEA Triggered Two Complementary Government
            Investigations. ...........................................................................11

    D.  After Defendants Implemented the NEA, Their "Once Vigorous"
        Competition Stopped and Travelers Were Harmed...................12

    E.  This Litigation................................................................................14

        1.  Plaintiffs "Convincingly" Established the NEA's
            Anticompetitive Effects. ...........................................................16

        2.  Defendants "Offered Minimal Evidence" that the NEA Yielded
            Procompetitive Benefits............................................................19

        3.  Plaintiffs Also Proved a Less Restrictive Alternative and that
            the NEA's Harms Outweighed Any Benefits. ...........................22

    F.  Post-Trial Proceedings .................................................................24

SUMMARY OF ARGUMENT .................................................................25

STANDARD OF REVIEW.......................................................................30

i

# TABLE OF CONTENTS—Continued

Page

ARGUMENT ...................................................................................... 31

I.  Plaintiffs Met Their Initial Burden Through a "Powerful Showing of Serious Anticompetitive Harm." ............................................... 33

   A.  The District Court's Findings Established Anticompetitive Harm Directly. ........................................................................... 33

      1.  Loss of Significant Head-to-Head Competition ........................ 34

      2.  Reduced Output ................................................................... 38

      3.  Reduced Consumer Choice ................................................... 39

   B.  Separately, Plaintiffs Carried Their Initial Burden Under the Indirect Approach. .................................................................... 39

      1.  The District Court Applied Well-Established Precedent in Finding that Defendants Had Market Power. ........................... 40

      2.  The District Court Correctly Found that the NEA Threatened to Harm Competition. ........................................................... 43

   C.  AA's Contrary Arguments Lack Merit ........................................ 47

      1.  No Special Rules Immunize Agreements Labeled "Joint Ventures." ......................................................................... 48

      2.  The Rule of Reason Does Not Ignore Evidence of Harm to Competition Other than Measured Price and Output Effects.. 53

      3.  The District Court Did Not Conduct a "Quick Look." .............. 61

II. The District Court Correctly Concluded that Defendants Failed to Prove that the NEA Benefited Competition. ................................... 62

   A.  Defendants' Claimed Benefits Failed for Lack of Evidence. ........ 64

   B.  Benefits to AA and JetBlue Do Not Necessarily Inhere to Consumers .................................................................................. 75

III. Even if Defendants Had Carried Their Step-Two Burden, Affirmance Would Still Be Warranted ........................................... 78

## TABLE OF CONTENTS—Continued

Page

A.  The District Court's Unchallenged Finding of a Less Restrictive Alternative Independently Supports the Judgment. .................78

B.  The District Court's Unchallenged Weighing of Harms and Benefits Independently Supports the Judgment. .......................79

CONCLUSION .........................................................................................82

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Addamax Corp. v. Open Software Foundation, Inc.*,
   152 F.3d 48 (1st Cir. 1998) ........................................................ 39, 43, 48

*Arbona-Custodio v. De Jesus-Gotay*,
   873 F.2d 409 (1st Cir. 1989) ............................................................... 32

*Augusta News Co. v. Hudson News Co.*,
   269 F.3d 41 (1st Cir. 2001) ................................................................. 43

*Board of Trade of City of Chicago v. United States*,
   246 U.S. 231 (1918) ....................................................................... 38, 56

*Business Electronics Corp. v. Sharp Electronics Corp.*,
   485 U.S. 717 (1988) ........................................................................... 49

*California Dental Ass'n v. FTC*,
   526 U.S. 756 (1999) ....................................................................... 56, 81

*Calandro v. Sedgwick Claims Mgmt. Servs., Inc.*,
   919 F.3d 26 (1st Cir. 2019) ............................................................ 30, 31

*Chicago Bridge & Iron Co. N.V. v. FTC*,
   534 F.3d 410 (5th Cir. 2008) .......................................................... 60, 71

*Chicago Professional Sports Ltd. Partnership v. NBA*,
   961 F.2d 667 (7th Cir. 1992) ............................................................... 62

*Citizen Publishing Co. v. United States*,
   394 U.S. 131 (1969) ....................................................................... 32, 62

*Clamp-All Corp. v. Cast Iron Soil Pipe Institute*,
   851 F.2d 478 (1st Cir. 1988) ............................................................... 34

*Construction Aggregate Transport, Inc. v. Florida Rock Industries, Inc.*,
   710 F.2d 752 (11th Cir. 1983) ............................................................. 49

*Copperweld Corp. v. Independence Tube Corp.*,
   467 U.S. 752 (1984)........................................................36, 49

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
   491 F.3d 380 (8th Cir. 2007)..............................................58

*Eastern Food Services, Inc. v. Pontifical Catholic University Services
   Ass'n, Inc.*,
   357 F.3d 1 (1st Cir. 2004)..................................................40

*Epic Games, Inc. v. Apple, Inc.*,
   67 F.4th 946 (9th Cir. 2023)..........................................43, 79

*Fishman v. Estate of Wirtz*,
   807 F.2d 520 (7th Cir. 1986)..............................................55

*Fraser v. Major League Soccer, LLC*,
   284 F.3d 47 (1st Cir. 2002)................................................79

*FTC v. H.J. Heinz Co.*,
   246 F.3d 708 (D.C. Cir. 2001)............................................77

*FTC v. Indiana Federation of Dentists*,
   476 U.S. 447 (1986)....................................................34, 56

*FTC v. IQVIA Holdings Inc.*,
   2024 WL 81232 (S.D.N.Y. Jan. 8, 2024)................................66

*FTC v. Staples, Inc.*,
   970 F. Supp. 1066 (D.D.C. 1997)........................................37

*FTC v. Wilh. Wilhelmsen Holding ASA*,
   341 F. Supp. 3d 27 (D.D.C. 2018)......................................66

*Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc.*,
   386 F.3d 485 (2d Cir. 2004)..............................................55

*Glen Holly Entertainment Inc. v. Tektronix, Inc.*,
   352 F.3d 367 (9th Cir. 2003)..............................................39

*Grappone, Inc. v. Subaru of New England, Inc.*,
    858 F.2d 792 (1st Cir. 1988) ..................................................76

*Hospital Corp. of America v. FTC*,
    807 F.2d 1381 (7th Cir. 1986)................................................71

*Impax Laboratories, Inc. v. FTC*,
    994 F.3d 484 (5th Cir. 2021)..................................................43

*Law v. NCAA*,
    134 F.3d 1010 (10th Cir. 1998)........................................75, 76

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)................................................................44

*MacDermid Printing Solutions LLC v. Cortron Corp.*,
    833 F.3d 172 (2d Cir. 2016) ...................................................59

*McLain v. Real Estate Board of New Orleans, Inc.*,
    444 U.S. 232 (1980)................................................................37

*National Society of Professional Engineers v. United States*,
    435 U.S. 679 (1978)....................................................... *passim*

*NCAA v. Alston*,
    594 U.S. 69 (2021) ........................................................ *passim*

*NCAA v. Board of Regents of University of Oklahoma*,
    468 U.S. 85 (1984) ........................................................ *passim*

*North American Soccer League, LLC v. United States Soccer Federation, Inc.*,
    883 F.3d 32 (2d Cir. 2018)...............................................45, 59

*Northern Pacific Railway Co. v. United States*,
    356 U.S. 1 (1958) ..............................................................1, 54

*NYNEX Corp. v. Discon, Inc.*,
    525 U.S. 128 (1998)................................................................34

vi

*Ohio v. American Express Co.*,
  585 U.S. 529 (2018) .......................................................... *passim*

*Palmer v. BRG of Georgia, Inc.*,
  498 U.S. 47 (1990) (per curiam) .................................... 32, 50

*Polygram Holding, Inc. v. FTC*,
  416 F.3d 29 (D.C. Cir. 2005) ............................................... 62

*Procaps S.A. v. Patheon, Inc.*,
  845 F.3d 1072 (11th Cir. 2016) ........................................... 47

*ProMedica Health System, Inc. v. FTC*,
  749 F.3d 559 (6th Cir. 2014) ............................................... 52

*Realcomp II, Ltd. v. FTC*,
  635 F.3d 815 (6th Cir. 2011) ......................................... 39, 43

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
  792 F.2d 210 (D.C. Cir. 1986) ............................................. 51

*Ryan v. U.S. Immigration & Customs Enforcement*,
  974 F.3d 9 (1st Cir. 2020) ................................................... 41

*SCFC ILC, Inc. v. Visa USA, Inc.*,
  36 F.3d 958 (10th Cir. 1994) ............................................... 51

*Standard Oil Co. of New Jersey v. United States*,
  221 U.S. 1 (1911) ................................................................ 55

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of Rhode
  Island*,
  373 F.3d 57 (1st Cir. 2004) ................................................. 33

*Sullivan v. NFL*,
  34 F.3d 1091 (1st Cir. 1994) ......................................... *passim*

*Timken Roller Bearing Co. v. United States*,
  341 U.S. 593 (1951) ............................................................ 49

*Tops Markets, Inc. v. Quality Markets, Inc.*,
142 F.3d 90 (2d Cir. 1998) ............................................................ 40, 47

*Toys "R" Us,* Inc. v. FTC,
221 F.3d 928 (7th Cir. 2000) ................................................................ 57

*United States v. Aetna Inc.*,
240 F. Supp. 3d 1 (D.D.C. 2017) .................................................... 37, 52

*United States v. Anthem, Inc.*,
855 F.3d 345 (D.C. Cir. 2017) ....................................................... 47, 66

*United States v. Apple, Inc.*,
791 F.3d 290 (2d Cir. 2015) ................................................................ 76

*United States v. Brown University*,
5 F.3d 658 (3d Cir. 1993) ...................................................... 57, 60, 77

*United States v. Dentsply International, Inc.*,
399 F.3d 181 (3d Cir. 2005) ................................................................ 39

*United States v. First National Bank & Trust Co. of Lexington*,
376 U.S. 665 (1964) ..................................................................... *passim*

*United States v. H&R Block, Inc.*,
833 F. Supp. 2d 36 (D.D.C. 2011) ........................................... 37, 44, 77

*United States v. JetBlue Airways Corp.*,
2024 WL 162876 (D. Mass. Jan. 16, 2024) ........................ 24, 39, 44, 47

*United States v. Jordan*,
813 F.3d 442 (1st Cir. 2016) ............................................................... 31

*United States v. Penn-Olin Chemical Co.*,
378 U.S. 158 (1964) ...................................................................... 49, 51

*United States v. Reyes-Santiago*,
804 F.3d 453 (1st Cir. 2015) ............................................................... 80

*United States v. Rockford Memorial Corp.*,
898 F.2d 1278 (7th Cir. 1990) ............................................................ 35

*United States v. Rostoff*,
   164 F.3d 63 (1st Cir. 1999) .................................................... 31

*United States v. Topco Associates, Inc.*,
   405 U.S. 596 (1972) ............................................................... 72

*United States v. Visa U.S.A., Inc.*,
   344 F.3d 229 (2d Cir. 2003) ......................................... *passim*

*US Airways, Inc. v. Sabre Holdings Corp.*,
   938 F.3d 43 (2d Cir. 2019) ............................................... 58, 59

*Vázquez-Ramos v. Triple-S Salud*,
   55 F.4th 286 (1st Cir. 2022) ................................................ 38

*Viamedia, Inc. v. Comcast Corp.*,
   951 F.3d 429 (7th Cir. 2020) ........................................... 43, 77

*Virgin Atlantic Airways Ltd. v. British Airways PLC*,
   257 F.3d 256 (2d Cir. 2001) ................................................. 58

*Yaman v. Yaman*,
   730 F.3d 1 (1st Cir. 2013) ................................................... 63

**Statutes**

15 U.S.C. § 1 ................................................................ *passim*

15 U.S.C. § 4 ................................................................... 4, 46

15 U.S.C. § 26 ...................................................................... 46

28 U.S.C. § 1291 .................................................................... 5

28 U.S.C. § 1331 .................................................................... 4

28 U.S.C. § 1337 .................................................................... 4

28 U.S.C. § 1345 .................................................................... 4

49 U.S.C. § 41720 ................................................................. 12

**Other Authorities**

FTC & DOJ, *Antitrust Guidelines for Collaborations Among Competitors* (2000), https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf ......................................................50

**REASONS WHY ORAL ARGUMENT SHOULD BE HEARD**

Oral argument would be helpful to the Court in this appeal. After a lengthy trial, the district court found that the Northeast Alliance (NEA) harmed competition and consumers in the Northeast United States, violating Section 1 of the Sherman Act. Oral argument would assist this Court in understanding why the record—and the district court's extensive factual findings—compelled this result.

## INTRODUCTION

Competition in air travel matters. Rivalry between competing airlines drives them to lower prices, improve quality, and schedule flights to best serve customer demand. The Sherman Act protects this competition: it "rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, [and] the highest quality." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958).

Competition between American Airlines (AA) and JetBlue matters to the millions of passengers who rely on flights out of Boston and New York to visit loved ones, do business, and vacation on a budget. The two airlines fiercely compete for the business of 32 million passengers annually who fly nonstop routes where the two are head-to-head rivals. On 23 of those routes, the two airlines' combined market share is between 30 and 96 percent.

The Northeast Alliance (NEA) ended that fierce competition. AA and JetBlue "no longer operate[d] in the northeast as two distinct carriers" and "work[ed] together as one combined carrier" from January 2021 until the NEA was enjoined in July 2023. ADD77. Indeed,

JetBlue's CEO frankly admitted that "American and JetBlue no longer 'compete[d] with each other directly' within the NEA region." *Id.* (quoting 1-JA119).

By entering into the NEA, the airlines eliminated critical competitive forces benefiting the public. Instead of "tactically respond[ing] to each other's fares," ADD39-40, they shared revenue on flights out of Boston and New York. And instead of competing on schedules to meet consumer demand, they allocated routes on which they had previously competed.

This was a remarkable arrangement. Although other airlines have entered into frequent flyer and ticket reciprocity agreements, never before had rival domestic airlines agreed to eliminate competition by sharing revenues from each other's competing ticket sales and jointly allocating which routes and schedules they would fly.

Even though these practices are per se unlawful on their own, AA and JetBlue denied that the NEA harmed competition. They claimed that they would remain competitors and that the NEA would yield significant procompetitive benefits. The district court gave them every

opportunity to prove those claims. But after a month-long trial, the court found that the evidence undercut their story at every turn.

The court's factual findings decide this appeal. The court found that the NEA eliminated competition between AA and JetBlue that had lowered prices and increased choice. The court found that the NEA turned rivals into partners, including on nearly two-dozen routes where the parties' combined shares establish market power, and that it reduced output on several key routes. And the court found that the NEA weakened JetBlue's incentives to act as a disruptive competitor and, based on economic modeling, would likely raise prices. These harms to competition were "significant." ADD88 n.91.

By contrast, the court found that AA and JetBlue's claims of procompetitive benefits failed. The evidence did not support the companies' arguments that the NEA made the airlines more effective competitors or more attractive to corporate customers or that the NEA increased fleet size, added new routes, or created other significant benefits. While the NEA made Defendants larger and more powerful, merely accumulating market power is anticompetitive, not procompetitive.

Finally, the court found that a more narrowly tailored alternative (which Defendants considered) could achieve the benefits they sought, and that any benefits were "overwhelmingly" outweighed by the NEA's anticompetitive effects. ADD101.

Those factual findings establish a textbook rule-of-reason violation. On appeal, AA does not claim clear error in any of them. Instead, it ignores them, inviting this Court to adopt novel legal standards that contradict settled precedent and the Sherman Act itself. AA would elevate form over substance by creating a new, deferential standard for all joint ventures that disregards quintessential anticompetitive harms—a proposal similar to one the Supreme Court recently rejected in *NCAA v. Alston*, 594 U.S. 69 (2021). AA would also require the flexible rule of reason to ignore valuable evidence of anticompetitive harm by looking only to quantified price and output effects, again contrary to decades of precedent. The Court should decline AA's invitations to ignore the facts and rewrite the law.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 15 U.S.C. § 4 and 28 U.S.C. §§ 1331, 1337(a), and 1345. The court entered final judgment on

July 28, 2023. AA filed a notice of appeal on September 25, 2023. 1-JA85. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

AA does not challenge any of the district court's factual findings as clearly erroneous, which are thus accepted as true for this appeal. The questions presented are:

1.  Whether the district court correctly determined that Plaintiffs satisfied their initial burden under the rule of reason, directly and indirectly, based on its unchallenged factual findings of many types of actual and likely anticompetitive effects and the NEA's market power.

2.  Whether the district court correctly concluded that Defendants failed to meet their burden of showing procompetitive justifications, given its factual rejection of Defendants' claims that the NEA caused increased output and benefited customers.

3.  Whether the district court's unchallenged factual findings support its determinations that the NEA's purported objectives could have been achieved by a less restrictive alternative and the NEA's harms far outweighed any benefits.

## STATEMENT OF THE CASE

This case concerns the NEA, an agreement of "'unprecedented' nature" that completely ended competition between two of the largest airlines in the Northeast. ADD12. The district court carefully considered the NEA over the course of a lengthy bench trial and concluded that it violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

### A. Defendants Are Major Competitors with Dominant Market Shares on Numerous Routes in the Northeast.

AA and JetBlue are both "formidable and influential" airlines. ADD10-11. AA, the largest airline in the world, is one of three large domestic "legacy" air carriers (with Delta and United). ADD10, ADD15 & n.4. JetBlue is a unique and important "disruptor" competing with these legacy carriers. ADD21-22. JetBlue provides high-quality service while maintaining a lower cost structure and offering lower fares. ADD21, ADD46.

In 2019, before the NEA, AA and JetBlue were leading competitors in the Northeast: they were "two of the four largest carriers operating in New York, and two of the largest three in Boston." ADD11. They competed to provide nonstop service on 29 routes to and from

Boston and New York, and they had dominant market shares on many of those routes—as high as 96%:

| | | Annual revenue share AA + B6 |
|---|---|---|
| **Markets with BOS endpoint** | | |
| 1. | Boston (BOS) – Charlotte (CLT) | 96.1% |
| 2. | Boston (BOS) – Washington National (DCA) | 88.0% |
| 3. | Boston (BOS) – Philadelphia (PHL) | 86.8% |
| 4. | Boston (BOS) – Rochester (ROC) | 86.2% |
| 5. | Boston (BOS) – Phoenix (AZA/PHX) | 85.2% |
| 6. | Boston (BOS) – Dallas/Fort Worth (DFW/DAL) | 83.6% |
| 7. | Boston (BOS) – Syracuse (SYR) | 82.1% |
| 8. | Boston (BOS) – Miami (MIA/FLL) | 76.5% |
| 9. | Boston (BOS) – Los Angeles (BUR/ONT/LAX/LGB/SNA) | 62.6% |
| 10. | Boston (BOS) – NYC (JFK/LGA/EWR) | 40.3% |
| 11. | Boston (BOS) – Chicago (MDW/ORD) | 48.5% |
| **Markets with NYC endpoint** | | |
| 12. | NYC (JFK/LGA/EWR) – Nantucket (ACK) | 84.0% |
| 13. | NYC (JFK/LGA/EWR) – Martha's Vineyard (MVY) | 92.5% |
| 14. | NYC (JFK/LGA/EWR) – Phoenix (AZA/PHX) | 52.8% |
| 15. | NYC (JFK/LGA/EWR) – West Palm Beach/Palm Beach (PBI) | 48.4% |
| 16. | NYC (JFK/LGA/EWR) – Los Angeles (BUR/ONT/LAX/LGB/SNA) | 40.7% |
| 17. | NYC (JFK/LGA/EWR) – Miami (MIA/FLL) | 48.3% |
| 18. | NYC (JFK/LGA/EWR) – Orlando (MCO) | 45.8% |
| 19. | NYC (JFK/LGA/EWR) – Boston (BOS)[5] | 40.3% |
| 20. | NYC (JFK/LGA/EWR) – Raleigh/Durham (RDU) | 30.3% |
| 21. | NYC (JFK/LGA/EWR) – Savannah (SAV) | 32.9% |
| 22. | NYC (JFK/LGA/EWR) – Las Vegas (LAS) | 27.9% |
| 23. | NYC (JFK/LGA/EWR) – San Francisco (SJC/OAK/SFO) | 24.9% |
| 24. | NYC (JFK/LGA/EWR) – San Diego (SAN) | 27.8% |
| 25. | NYC (JFK/LGA/EWR) – Austin (AUS) | 27.2% |
| 26. | NYC (JFK/LGA/EWR) – Charleston (CHS) | 30.2% |
| 27. | NYC (JFK/LGA/EWR) – Portland, ME (PWM) | 25.6% |
| 28. | NYC (JFK/LGA/EWR) – Chicago (MDW/ORD) | 31.4% |
| 29. | NYC (JFK/LGA/EWR) – Atlanta (ATL) | 11.2% |

2-JA1295 (DX-1055).[1]

---

[1]     "B6" is JetBlue's airline code. ADD89 n.93.

## B. Before the NEA, Defendants Competed Vigorously on Northeast Routes—and Consumers Benefited.

JetBlue's "aggressive approach to competing with" AA and other legacy carriers is "well documented": when JetBlue entered a market, fares went down, and when JetBlue exited, fares went up—the so-called "JetBlue Effect." ADD22 & n.13. Before the NEA, JetBlue "trigger[ed] fare responses by American" and lowered fares for Northeast travelers. ADD22. After JetBlue entered the Boston-Washington Reagan (DCA) route, for example, AA lowered its fares on the route by 60%. 5-JA3511. AA constrained JetBlue's pricing, too. When AA suspended flying JFK-San Diego, JetBlue responded by raising its fares on that route. ADD22; 1-JA221-26.

AA and JetBlue also competed by offering more flights on key routes. In 2019, for instance, AA announced new service on Boston-Austin to "[g]o get our share back from [Delta] and [JetBlue]." 3-JA1459-60. In "retaliation" for AA's move, JetBlue added frequency to Boston-Austin and numerous other Boston routes. 1-JA274-76.

Defendants competed on product quality as well. JetBlue's introduction of Mint, its premium-class service, "elevated the customer experience" compared with legacy carriers' higher-priced products, 1-

8

JA101 (JetBlue CEO), which "increased demand for premium seats" on transcontinental routes, ADD22. In response, AA and other carriers substantially cut fares, ADD22, increased capacity, 5-JA3508-10, and improved premium cabin quality, 5-JA2852.

## C. Instead of Continuing to Compete, Defendants Formed the NEA.

Defendants each had ambitious plans to expand in the Northeast before the NEA. ADD53-54. JetBlue's strategy called for increasing its daily departures in Boston and at New York's JFK and Newark Airports, ADD53, and it had agreed to lease at least 27 of AA's JFK slots.[2] ADD28; ADD53 & n.59; 3-JA1517; 1-JA376-78. AA, meanwhile, planned to increase capacity in Boston, ADD54, and obtain three new gates there, 1-JA280-82; 3-JA1457; 3-JA1503. AA also planned to increase capacity in New York using its existing slot portfolio, ADD54; 1-JA513-16, 3-JA1710, which it had been "knowingly underutiliz[ing]," ADD98 n.110.

---

[2]    A slot is "authorization from the FAA to land or take off during a particular period of time." ADD20. JFK and LaGuardia Airports are both slot-controlled. *Id.*

In late 2019, however, Defendants shelved these plans and began discussing an alliance. ADD28. They considered several options, including an "East Coast [International] Alliance" connecting JetBlue's domestic flying with AA's international flying, similar to AA's existing "West Coast International Alliance" with Alaska Airlines. ADD50-51; 3-JA1649. But Defendants opted for the NEA, a merger-like arrangement, ADD37, even though they understood it presented greater "potential antitrust risk," 5-JA3121. They finalized the NEA in July 2020. ADD30.

### 1. Defendants Acted Like One Airline in the Northeast.

Under the NEA, AA and JetBlue "function[ed] like a single airline" at Boston Logan and New York's LaGuardia, JFK, and Newark Airports. ADD38; *see* 3-JA1392-93. The NEA's principal features were:

- ***Joint network planning and capacity coordination.*** Defendants jointly set schedules and capacity on most routes touching NEA airports. ADD30-31.

- ***Revenue sharing.*** Defendants shared revenue from NEA flights. *See* ADD31-32; 3-JA1423-56. Thus, Defendants were "metal neutral[]," i.e., "indifferent to whether a passenger flies a particular NEA route on an American plane or a JetBlue plane." ADD31.

- ***Codesharing.*** Defendants could market and sell tickets on each other's domestic NEA flights. ADD31 & n.27; 2-JA1180-1220.

- ***Slot leases and restrictions.*** AA leased 69 LaGuardia slots and 30 JFK slots to JetBlue; JetBlue leased eight JFK slots to AA. ADD37. Neither could sell or transfer more than 20% of its slots at JFK or LaGuardia to other carriers. ADD35; 3-JA1413.

- ***Loyalty program reciprocity.*** Members of each Defendant's loyalty program could earn and redeem frequent-flier miles on the other's NEA flights. ADD31.

This combination of features was "unprecedented" in the domestic airline industry, ADD12, because many airlines, including Defendants, understood that it was legally risky for domestic carriers to share revenue and coordinate capacity, ADD87-88; 1-JA127-28. The NEA was instead modeled on international alliances, 1-JA384, 5-JA3458-59, which require immunity from regulators because their output coordination and revenue sharing otherwise would violate antitrust law, ADD87.

### 2.    The NEA Triggered Two Complementary Government Investigations.

After Defendants announced the NEA in July 2020, both the Department of Transportation (DOT) and the Department of Justice

11

(DOJ) opened investigations. DOT and DOJ have separate authority to review airline joint ventures, 3-JA1776, under 49 U.S.C. § 41720 and the Sherman Act, respectively.

The DOT review was "informal[]," 3-JA1775, and "was not designed to approve or disapprove the alliance," 3-JA1776. Defendants committed to divest a small number of slots at JFK and DCA, ADD35-36, and to grow capacity in New York until 2025, ADD36; 2-JA1025-27. But these commitments "did not address all of [DOT]'s concerns," 3-JA1776-77, because, among other things, they did not address flights at Boston, ADD101 n.113. DOT entered into an agreement with these limitations because it "intend[ed] to defer to DOJ, as the primary enforcer of Federal antitrust laws, to resolve antitrust concerns with respect to the NEA." 3-JA1779; ADD62-63.

## D. After Defendants Implemented the NEA, Their "Once Vigorous" Competition Stopped and Travelers Were Harmed.

Under the NEA, Defendants "no longer compete[d] with one another" on NEA routes. ADD38; 1-JA119 (JetBlue's CEO). And because they were sharing revenues, Defendants were "not trying to attract passengers away from [each other] on those routes anymore." 2-

JA829 (AA executive); *see, e.g.*, 5-JA3139 (JetBlue's director of sales saying that if business shifted to AA, "that is okay" because "[i]n the end the revenue is pooled"); 5-JA3451 (instructing AA staff to "[m]aximize revenue between the two" Defendants).

Next, Defendants allocated markets and reduced capacity on important NEA routes:

- ***Market allocation.*** Defendants divided NEA routes with the goal of only having "one carrier per market wherever possible." ADD82. On some routes, one Defendant ceded the route to the other by exiting altogether. ADD43; ADD82. For example, AA exited the busy Boston-LaGuardia route, ADD82, even though it had no pre-NEA intentions to drop that route, 2-JA839. Defendants also declined to enter markets each other already served; for example, AA declined to fly Boston-Raleigh/Durham and Boston-Austin, despite prior plans to do so. 3-JA1483. And on routes that both Defendants continued to serve under the NEA, Defendants divided time slots between themselves. ADD43-44. They planned their joint schedule to minimize or eliminate "wing tips"—i.e., competing flights departing around the same time. ADD43-44; 1-JA579-80.

- ***Reduced capacity.*** Defendants reduced capacity on the Boston-DCA route that both served, ADD44-45, and offered fewer total flights on Boston-LaGuardia, ADD44, and JFK-San Francisco, 5-JA2946, which were allocated to JetBlue. And to fly the JFK-San Francisco route by itself, JetBlue had to pull Mint planes from other transcontinental routes. *See* ADD96; 5-JA2946-47.

Finally, under the NEA, JetBlue's costs increased and its opportunities to access new markets decreased—both of which weakened JetBlue in its "unique role" as a disruptive, low-cost competitor. ADD82; ADD46-48. The NEA raised JetBlue's costs by requiring it to pay higher airport costs and spend more on IT systems. ADD46; ADD80-81; 1-JA131. Due to the increased costs, JetBlue considered reductions in service quality, such as overbooking flights. 5-JA3137.

JetBlue also lost opportunities to access new markets because of the NEA. ADD46-48; ADD80-81. The U.K. Competition and Markets Authority found JetBlue ineligible for free "remedy slots" at London's Heathrow Airport because the slots were for airlines "independent of" AA. ADD80; 5-JA3019; 5-JA3503-05. And JetBlue lost a bid to secure peak-hour Newark runway timings. ADD47-48; ADD80.

## E. This Litigation

Plaintiffs brought this rule-of-reason challenge in September 2021 to enjoin the NEA under Section 1. 1-JA43. Following a month-long bench trial with 24 live witnesses and 17 additional witnesses testifying by deposition, 1,200 pages of expert reports, and 631 record exhibits,

the district court issued a 94-page opinion. The court rejected, as a matter of fact, nearly all of Defendants' arguments; credited Plaintiffs' expert witness instead of Defendants' experts; and concluded that the NEA violated Section 1. ADD102.

The court followed the burden-shifting framework of a full rule-of-reason analysis. ADD72.[3] Under that framework, the plaintiff must make an initial showing, directly or indirectly, that the challenged agreement has a substantial anticompetitive effect. *Id.* "If the plaintiff succeeds, the burden shifts to the defendant 'to show a procompetitive rationale for the restraint.'" ADD73 (citation omitted). If the defendant makes this showing, "the ultimate burden returns to the plaintiff." *Id.* The plaintiff can prevail "with proof that 'the procompetitive efficiencies could be reasonably achieved through less anticompetitive means'" (a less restrictive alternative) or that, "on balance, the restraint's anticompetitive effects outweigh any procompetitive benefits." *Id.* (citation omitted).

---

[3]     Section 1 of the Sherman Act proscribes "unreasonable" restraints of trade. *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) ("*Amex*"). Restraints can be unreasonable under the per se rule or the rule of reason. *Id.*

15

### 1. Plaintiffs "Convincingly" Established the NEA's Anticompetitive Effects.

**a.**    The district court found, under the direct approach to step one, that the NEA had caused actual harm to competition in "at least three ways." ADD76. First, the NEA eliminated head-to-head competition between AA and JetBlue—competition that had benefited passengers. Defendants "function[ed] like a single airline in the NEA region" and "no longer adhere[d]" to their former "competitive practices," such as "respond[ing] to each other's fares" or "launching new service to directly compete" on routes. ADD38-40.

Second, JetBlue was weakened as a "maverick" competitor. The NEA "diminish[ed] JetBlue's ability to provide disruptive, low-cost competition" to the legacy carriers in Northeast markets. ADD48.

Third, the NEA allocated markets. In numerous markets, including 13 at LaGuardia alone, the NEA "allocated the route to one [Defendant] and caused the other to exit." ADD43. "The only reason either defendant stopped service on these routes [was] the NEA." *Id.*

**b.**    The district court also held that Plaintiffs satisfied their burden under the indirect approach by showing the NEA's market

power and "evidence that the challenged restraint harms competition." ADD84 (citation omitted).

First, the court found that Defendants had market power. ADD85-86. The court defined the relevant product market in this case as "scheduled air passenger service" and the relevant geographic markets as routes with Boston or New York as an endpoint where Defendants competed or would likely compete. ADD84-85. The court concluded that the NEA's high market shares in many of these markets supported a finding of market power, particularly given that the NEA markets were "highly concentrated" and protected by "significant barriers to entry." ADD86. Defendants' combined shares in relevant nonstop overlap markets were substantial, ranging as high as 96%. 2-JA1295.[4] Moreover, Defendants' overall capacity share was 52% in Boston, 5-JA3401 (cited at ADD78 n.79), and at least 25% in New York, ADD86

---

[4]    Defendants carved six of the nonstop overlap routes out of the NEA's capacity-coordination and revenue-sharing provisions. ADD36-37. But the district court found that Defendants had stopped competing even on those "carve-out routes." ADD78. And other provisions of the NEA, such as its codesharing and frequent-flyer reciprocity provisions, applied to these routes, ADD37, enabling Defendants to collaborate rather than compete, ADD101 n.113.

(citing 5-JA3223-24), further underscoring their substantial market share on numerous NEA routes.

As the court explained, the scarcity of gates and slots at NEA airports created "significant—and in some instances insurmountable—barriers to entry." ADD79. JFK and LaGuardia slots "rarely become available," and the NEA "fortif[ied]" this barrier by limiting Defendants' slot transfers to non-NEA carriers. *Id.* Similarly, the "scarce supply" of gates prevented entry and expansion in Boston. ADD11. These obstacles "block[ed] other carriers from constraining harms flowing from" the NEA. ADD79.

Defendants' conduct also showed directly that the NEA had market power (i.e., the ability to influence market prices) because Defendants had demonstrated such influence over prices in the past. ADD85-86. And they now made joint decisions about whether JetBlue would serve a market, which augmented their power since the JetBlue Effect depended on the presence of JetBlue's "unique" product. ADD86 n.88.

In addition to Defendants' market power, the court found that the NEA was likely to harm competition. The NEA represented "the

alignment of two distinct and powerful competitors in a unique and congested region." ADD86-87. In addition to the numerous harms it had already found, the court found that the NEA exerted upward pressure on prices. ADD56. The court agreed with the analysis of Plaintiffs' expert Dr. Nathan Miller, who explained that the NEA's revenue sharing aligned Defendants' incentives to raise fares. *Id.*; 1-JA661.

### 2. Defendants "Offered Minimal Evidence" that the NEA Yielded Procompetitive Benefits.

Because Plaintiffs met their initial burden with "strength," the burden shifted to Defendants to prove that the NEA yielded "substantial" procompetitive benefits. ADD88. Defendants did not carry that burden. ADD102. The court found not credible the expert witnesses Defendants called to testify to the NEA's competitive effects and consumer benefits, rejecting their opinions due to their bias and demeanor and the record evidence undermining their opinions. ADD62. And Defendants' other evidence failed to establish any of Defendants' claimed benefits.

**a.** The court rejected, on factual grounds, Defendants' claim that the NEA "pool[ed]" their resources to "maximize customer value." ADD89. The court found that that was "simply not a fair

characterization of the NEA's 'underlying purpose,' based on the weight of the evidence presented at trial." *Id.* Rather, Defendants' goal was merely to get "larger and more powerful," ADD10, "to keep pace with Delta," ADD89-90.

Moreover, the court found that Defendants failed to prove that the NEA actually increased customer value. The NEA provoked only a "milquetoast" response from Delta and United, undermining Defendants' claim that the NEA encouraged more competition. ADD95. The court found that the NEA was not "innovative" for travelers, ADD92-93: most travelers buy "a ticket for a flight (or flights) from one place to another," and the NEA did not "revolutionize[] that 'product' in any way." ADD93 n.97. Nor did the NEA increase Defendants' attractiveness to corporate customers: no corporate customer requested a joint NEA bid for travel, ADD46, and there was "no significant evidence that Defendants were losing corporate accounts before the NEA or ha[d] gained new accounts because of it," ADD95 n.100.

Thus, the NEA simply made Defendants larger, which is not "'procompetitive' under the law." ADD90.

**b.**    Although Defendants pointed to an increase in capacity at NEA airports, the district court rejected the claim that the NEA was responsible for "add[ing] new flying [Defendants] could not otherwise have pursued." ADD98. The evidence showed that Defendants both had pre-NEA plans for growth in the Northeast, ADD53-54; for example, AA had already been planning to "upgauge" its regional jets in New York, replacing them with larger ones, and AA had already agreed to lease New York slots to JetBlue, which would increase JetBlue's New York flying. ADD96 & n.104; *see, e.g.*, 3-JA1723. Thus, the court could not "attribute [such] growth to the NEA." ADD98 n.110.

Defendants also claimed that the NEA caused them to enlarge their fleets, but the evidence undercut that claim as well. ADD95. JetBlue asserted that it had delayed the retirement of certain aircraft to support the NEA, but the evidence showed that JetBlue contemplated doing so even without the NEA. ADD41 n.44. JetBlue also claimed it had accelerated orders for new aircraft due to the NEA, but the court found those planes were part of JetBlue's plan "with or without the NEA." ADD41 n.44. AA, meanwhile, could only suggest "gently" that the NEA was "'in part' responsible for 'additions'" to its

fleet; its vice president of network strategy undercut even that claim by "declin[ing] to directly attribute such (potential, future) expansion strategies to the NEA." *Id.*; *see* 2-JA825-826.

The court additionally found that any capacity growth in NEA markets came "at the expense of at least some pre-NEA plans to devote resources to growth elsewhere." ADD40. The court could not attribute "growth" that came from simply moving planes around to the NEA, rather than to other factors—such as Defendants' incentive to "artificially inflate capacity in the [New York] airports" so they could meet their commitments to DOT. ADD101 n.113.

Defendants lastly claimed that they launched new routes from NEA airports after the NEA was announced. But no "reliable evidence" showed that any new routes were attributable to the NEA. ADD97. Indeed, like the other purported "growth" from the NEA, the claimed new routes were "funded by planes pulled from other locations." *Id.*

### 3. Plaintiffs Also Proved a Less Restrictive Alternative and that the NEA's Harms Outweighed Any Benefits.

**a.** The court found that a less restrictive alternative to the NEA existed: "a more limited" alliance, similar to AA's West Coast

22

International Alliance (WCIA) with Alaska Airlines, paired with slot leases. ADD100.

The WCIA includes a codesharing arrangement between AA and Alaska; reciprocal access to lounges and benefits for each airline's frequent flyers; and capped revenue sharing. ADD25. However, the WCIA does not include routes on which both airlines offer competing nonstop service, and the WCIA airlines do not "coordinate schedules" or "allocate markets." ADD26.

The court found that Defendants could have used a "WCIA-style arrangement to leverage any complementary aspects of their networks, better compete with Delta, and use JetBlue's domestic traffic to feed American's international service out of the northeast." ADD100. Defendants could have "[s]upplement[ed]" that WCIA-style alliance "with a slot lease in New York, such as the one the defendants were negotiating before the pandemic." *Id.*

The court found—based on AA's own pre-NEA analysis of a WCIA-style option—that such a venture "offered comparable value and would have spurred comparable growth" to the NEA. ADD52 (citing 3-JA1649 and 2-JA864-65). The court further found that a WCIA-type alliance

23

would have yielded "comparable competitive responses" from Delta and United to those that "followed the NEA[]." ADD52-53.

**b.**     The court finally concluded that if the NEA's anticompetitive harms were weighed against its procompetitive benefits, "the scales" would "tip overwhelmingly in the plaintiffs' favor." ADD101. The anticompetitive harms that Plaintiffs proved were "considerable and obvious," ADD76, while Defendants had "produced minimal objectively credible proof to support" any of their claimed benefits, ADD13.

### F. Post-Trial Proceedings

Before the district court entered its final injunction, JetBlue terminated the NEA, Dkt. 370 at 17:15-17, purportedly to focus more on its then-pending merger with Spirit Airlines (now enjoined, *United States v. JetBlue Airways Corp.*, 2024 WL 162876 (D. Mass. Jan. 16, 2024), *appeal dismissed* (1st Cir. Mar. 5, 2024)).

The court issued a final injunction prohibiting agreements between the two Defendants that are "substantially similar" to the NEA. ADD6. While Plaintiffs had requested a broader injunction— preventing Defendants from entering into any substantially similar agreement with any other domestic airline, Dkt. 358-1 at 6—the court

denied that relief, explaining that its decision had "depend[ed] considerably on the particular circumstances of the case," including "the characteristics of the NEA agreements[] and the specific geographic region and markets for air travel that were impacted by the defendants' conduct." Dkt. 373 at 3.

## SUMMARY OF ARGUMENT

This case turned on the evidence at trial and the parties' respective burdens. The district court properly applied the legal framework of a full rule-of-reason analysis—concluding, after examining all the evidence, that Plaintiffs had carried their burden while Defendants had not carried theirs.

**I.    AA fails to show error in the district court's analysis of Plaintiffs' initial burden.**

A.  The court correctly held that Plaintiffs carried their initial burden under the direct approach by showing numerous actual anticompetitive effects, each of which is individually sufficient.

In particular, the court found that the NEA eliminated competition between AA and JetBlue in the Northeast. Defendants no longer competed *at all*—on "fares, schedules, service, advertising, or

25

anything else." ADD78; *see* ADD39-40. Eliminating "significant competition" between two firms that are "major competitive factors" in the market is an actual anticompetitive harm. *United States v. First National Bank & Trust Co. of Lexington*, 376 U.S. 665, 673 (1964) ("*Lexington Bank*"). The NEA weakened JetBlue's incentive and ability to act as a disruptive competitor, ADD48, itself an anticompetitive effect. And the NEA "reduc[ed] the importance of consumer preference in setting price and output." *NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 107 (1984). Defendants allocated NEA markets among themselves and pooled revenues, ADD37, ADD83—two types of restraints recognized to be per se unlawful—enabling them to use their collective market power to, among other things, set price and output.

The court also found that the NEA lowered output by decreasing capacity and reducing flight frequencies on "multiple routes, including some that are heavily traveled." ADD43; p. 13, *supra*. And the NEA reduced "the number of distinct choices for consumers" in already-concentrated NEA markets. ADD77. These, too, are actual anticompetitive effects.

26

B.  The court also correctly held that Plaintiffs carried their initial burden under the indirect approach by showing the NEA had market power and tended to harm competition. The district court applied this Court's test for market power, looking at Defendants' shares in the relevant markets and barriers to entry. It also found market power through evidence that Defendants had the demonstrated ability to influence market prices.

The court then found that the NEA had substantial anticompetitive tendencies. The NEA combined two significant competitors and thus was likely to reduce competition substantially. It put upward pressure on Defendants' fares: each Defendant was incentivized to raise fares to higher altitudes under the NEA because its revenue-sharing mechanism would allow them to recapture revenue lost after a price increase. And it raised barriers to entry in the Northeast by preventing Defendants from transferring slots to other airlines.

C.  AA's attempts to end-run the court's findings of substantial anticompetitive harm are unavailing. Labeling the NEA a "joint venture" does not change the applicable standard or render features like capacity coordination, revenue sharing, and market allocation—

27

which are routinely condemned under antitrust law—competitively benign.

AA argues that already-observed price and output effects are the only ways to establish actual anticompetitive harm, but controlling precedent is to the contrary. And even if already-observed effects on prices or output were required, the district court's unchallenged findings of decreased frequencies and capacity on key routes establish such effects.

Finally, AA's claim that the district court conducted a "quick look" fails. The court considered every issue and made every finding required by a full rule-of-reason framework. The court found the NEA's anticompetitive effects "considerable and obvious," ADD76, but that does not make the court's comprehensive analysis a "quick look."

**II.**    AA also fails to show error in the district court's holding that Defendants failed to show that the NEA yielded procompetitive benefits. The court carefully considered Defendants' evidence at step two, finding that the evidence did not support—and often contradicted—Defendants' story. The court concluded that the NEA

28

produced minimal proven benefits for consumers and instead simply made Defendants bigger.

The court discredited the benefits opinion of Defendants' expert, Dr. Mark Israel, finding him biased and his analysis substantively flawed because of its false assumptions and cherry-picked data. It considered and rejected Defendants' claim that the NEA increased output, concluding that Defendants had *not* proved that the NEA—rather than a host of other factors—caused an increase in their output of flights, routes, or planes. ADD95-98. And the court factually rejected Defendants' assertions that the NEA made them more attractive to consumers, finding that Defendants' goal was not to improve their product, ADD89, and that the record showed they did not actually become more attractive to either individual travelers or corporate customers, ADD92-95.

AA's failure at step two was "rooted" in the court's extensive factual findings, not the legal error that AA claims. Br. 45. The court acknowledged that joint ventures can increase efficiency and enhance competition. ADD72, ADD92-94. But as the court explained, Defendants could not justify the NEA by "pointing out that *other* joint ventures

have often produced efficiencies"; Defendants were required to show that *the NEA* yielded procompetitive benefits. ADD93 (emphasis added). They did not do so, and the court rightly held that Defendants could not overcome that failure of proof by relabeling the NEA's anticompetitive features as procompetitive benefits. The NEA simply made Defendants larger, which is not itself procompetitive.

**III.**    Even if Defendants had carried their step-two burden, affirmance would be warranted based on either or both of the district court's determinations that a less restrictive alternative would produce *all* of Defendants' claimed procompetitive benefits and that the NEA's harms would far outweigh those benefits. AA incorrectly suggests that the court's step-three analysis did not account for the NEA's purported benefits. Br. 53-54. And by not raising other step-three issues or balancing at all in its brief, AA has forfeited any challenge to these parts of the opinion.

## STANDARD OF REVIEW

Following a bench trial, this Court reviews the district court's conclusions of law de novo. *Calandro v. Sedgwick Claims Mgmt. Servs., Inc.*, 919 F.3d 26, 33 (1st Cir. 2019). In contrast, the district court's

factual findings "must be honored" unless clearly erroneous. *Id.* This
Court's "deference is even greater" when factual findings "are based on
determinations regarding the credibility of witnesses," *United States v.
Rostoff*, 164 F.3d 63, 71 (1st Cir. 1999), including expert witnesses,
*United States v. Jordan*, 813 F.3d 442, 447 (1st Cir. 2016).

## ARGUMENT

The "'statutory policy' of the [Sherman] Act is one of competition."
*Alston*, 594 U.S. at 95. "The rule of reason requires courts to conduct a
fact-specific assessment" of a restraint's effect on competition, *Amex*,
585 U.S. at 541, and this case was decided by the facts the district court
found. The court credited Plaintiffs' showing that the NEA caused
substantial harm to competition, making the public worse off. By
contrast, the court found Defendants' witnesses not credible and their
claims of procompetitive benefits unsupported.

On appeal, AA tries to replace the district court's extensive factual
findings with an alternative set of facts that the court expressly
rejected. AA relies on evidence that the district court did not credit,
faults the court for not making factual findings that it actually made,
and claims concessions that Plaintiffs did not make. At bottom, AA's

31

"grievance" is "not one of law, but of fact"—and like other efforts to "rehearse[] the evidence and reargue[] its weight and purport" on appeal, this one is "foredoomed." *Arbona-Custodio v. De Jesus-Gotay*, 873 F.2d 409, 410 (1st Cir. 1989).

The NEA encompassed a collection of restraints including, among others, a market-allocation agreement and an agreement to share revenues from Defendants' respective (and formerly competing) flights, which were designed to make both carriers "metal neutral"—i.e., "indifferent to whether a passenger [flew] a particular NEA route on an American plane or a JetBlue plane." ADD31-32, ADD43-45. On their own, restraints of these types are subject to *per se* rules because of their anticompetitive character. *See Palmer v. BRG of Georgia, Inc.*, 498 U.S. 47, 49 (1990) (per curiam) (market allocation); *Citizen Pub. Co. v. United States*, 394 U.S. 131, 135 (1969) (profit-pooling). And those restraints harmed competition here: while AA continues to assert on appeal that "[e]ach airline continued to price flights independently," Br. 10, 38, 47, the district court found—consistent with executives' admissions at trial—that "[t]here is simply no credible evidence that American and JetBlue have continued to treat each other as

competitors within the NEA." ADD39, ADD78; 1-JA119 (JetBlue CEO); 2-JA829 (AA executive).

Contrary to AA's claim that the district court reflexively condemned the NEA, the district court engaged in a "deep and searching review of the voluminous record" under the rule of reason. ADD76. Its findings at every step of that analysis established the NEA's unlawfulness and refute AA's arguments on appeal.

## I.    Plaintiffs Met Their Initial Burden Through a "Powerful Showing of Serious Anticompetitive Harm."

Under the rule of reason, Plaintiffs had an initial burden to show, directly or indirectly, that the NEA had a substantial anticompetitive effect in at least one relevant market. *Amex*, 585 U.S. at 541; *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 61 (1st Cir. 2004). Plaintiffs satisfied this initial burden—as the district court correctly found—through both direct and indirect proof. ADD76-88.

### A. The District Court's Findings Established Anticompetitive Harm Directly.

Under the direct approach, plaintiffs can establish a prima facie case through "proof of actual detrimental effects on competition." *Amex*,

585 U.S. at 542 (brackets omitted). Here, Plaintiffs satisfied the direct approach through the district court's findings that the NEA (1) eliminated significant head-to-head competition, *Lexington Bank*, 376 U.S. at 671-72; *Amex*, 585 U.S. at 550; (2) reduced output, *id.* at 542; and (3) reduced consumer choice, *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986) ("*IFD*"). Each set of findings is independently sufficient.

### 1.    Loss of Significant Head-to-Head Competition

The district court found the NEA harmed "competition itself," *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998), by ending significant head-to-head competition in the Northeast, which had, among other benefits, lowered fares, increased output, and increased quality for consumers.

The Sherman Act rests on the principle that "competition will produce not only lower prices, but also better goods and services" in the long run. *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 695 (1978). Harm to "the competitive process, *i.e.*, to competition itself," is thus not only cognizable, *NYNEX*, 525 U.S. at 135; *see Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 486 (1st Cir. 1988) (Breyer,

34

J.), but the "most significant" kind of anticompetitive effect, *Bd. of Regents*, 468 U.S. at 107.

Accordingly, in *Lexington Bank*, the Supreme Court held that when two firms "are major competitive factors in a relevant market, the elimination of significant competition between them" is an anticompetitive harm. 376 U.S. at 671-72 (relying on four earlier Supreme Court cases); *Bd. of Regents*, 468 U.S. at 100 n.39 (agreeing that "a court would not hesitate in enjoining a domestic selling arrangement" between "major factors" in the same market that "eliminate[d] important price competition between them"). The Supreme Court reaffirmed this principle in *Amex*, observing that the plaintiffs there could have satisfied their initial burden by showing that the challenged restraint "ended competition between credit-card networks with respect to merchant fees." 585 U.S. at 550.[5]

This case fits squarely within *Lexington Bank*. Defendants were major factors in the Northeast, accounting for 25 to 96% of various

---

[5]    Eliminating substantial head-to-head competition is not *unlawful* if there are sufficient offsetting procompetitive benefits. *See United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1283 (7th Cir. 1990). But eliminating such competition satisfies a plaintiff's initial burden—as *Amex* and *Board of Regents* show.

35

relevant markets. JA1295. And they were vigorous direct competitors before they agreed to stop competing. They undercut each other's prices, causing "substantial, market-wide reduction[s] in fares." ADD22. They introduced new service and products in each other's markets, intensifying their competitive pressure on one another. *Id.*; *see* pp. 8-9, *supra*. And they used discounts and services to woo each other's customers. ADD22; 5-JA2896 (pre-NEA pitch by JetBlue to "win some of [a corporate customer's] AA loyalists"). Under the NEA, however, Defendants "no longer adhere[d] to these competitive practices with respect to one another." ADD39-40.

Instead, Defendants jointly set capacity, ADD30, allocated individual routes to one defendant, ADD43, and shared revenues on NEA flights, ADD31-32. This arrangement aligned the airlines' incentives and decision-making, allowing them to set price and capacity levels to maximize their collective revenue, 1-JA669, 5-JA3451, even if that meant leaving consumer demand unfulfilled. This harmed the competitive process by, among other things, making price and output "unresponsive to consumer preference." *Bd. of Regents*, 468 U.S. at 107; *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768-69 (1984)

(noting the anticompetitive potential when "two or more entities that previously pursued their own interests separately are combining to act as one for their common benefit").

Beyond eliminating the airlines' substantial direct competition, the NEA undercut JetBlue's "unique role in market" as a disruptive competitor driving down market-wide prices. ADD82. Maverick firms like JetBlue often "play[] a disruptive role in the market to the benefit of customers" by "tak[ing] the lead in price cutting" or "resist[ing] otherwise prevailing industry norms to cooperate on price setting or other terms of competition." *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 79 (D.D.C. 2011). Thus, suppressing the inherently unpredictable competition of a maverick is itself an anticompetitive harm. *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 43 (D.D.C. 2017); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1083 (D.D.C. 1997).

Finally, the district court found that the NEA did not merely have the *effect* of ending Defendants' head-to-head competition: it was "designed and intended" to end that competition. ADD101-02. That further demonstrated its anticompetitive harm. *See McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 243 (1980) ("[I]n a civil

37

action under the Sherman Act, liability may be established by proof of *either* an unlawful purpose or an anticompetitive effect."); *Bd. of Trade of City of Chi. v. United States*, 246 U.S. 231, 238 (1918) (while "a good intention" does not "save an otherwise objectionable" restraint, evidence of "intent may help the court to interpret facts and to predict consequences").

## 2. Reduced Output

AA misstates the record by asserting that "the district court never made a finding that the NEA led" to a "reduction of output in any relevant market." Br. 32. In truth, the district court found that the NEA reduced output by decreasing capacity and lowering frequencies on "multiple routes, including some that are heavily traveled." ADD43; *see* pp. 13, 26, *supra*. And the elimination of one defendant or the other from numerous routes itself "demonstrated 'reduced output'" and "constitute[d] 'direct evidence' of anticompetitive effects." *Vázquez-Ramos v. Triple-S Salud*, 55 F.4th 286, 299 (1st Cir. 2022) (brackets omitted); *see Sullivan v. NFL*, 34 F.3d 1091, 1101 (1st Cir. 1994) ("By restricting output in one *form* of ownership, the NFL is thereby reducing the output of ownership interests overall.").

38

### 3.    Reduced Consumer Choice

Lastly, the NEA diminished consumer choice. Defendants' market allocation and exits from various routes and time slots reduced the number of choices available to consumers in particular markets or traveling at specific times. ADD43-44 & n.45. This direct interference with consumers' ability to "mak[e] free choices between market alternatives" was an actual anticompetitive harm. *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 374 (9th Cir. 2003) (quotation marks omitted); *see, e.g.*, *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 194 (3d Cir. 2005) (restraint had an anticompetitive effect by "limit[ing] the choices of products open to dental laboratories"); *JetBlue Airways*, 2024 WL 162876, at *28 ("[E]limination of a product option that consumers value is a cognizable harm to competition.").

## B. Separately, Plaintiffs Carried Their Initial Burden Under the Indirect Approach.

Turning from the direct to the indirect approach, the district court correctly found that Plaintiffs' proof of *likely* anticompetitive effects separately satisfied their initial burden. *See Addamax Corp. v. Open Software Found., Inc.*, 152 F.3d 48, 53 (1st Cir. 1998) ("a sufficiently high *risk* of an anticompetitive effect" meets plaintiff's burden); *see also*

*Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 825 (6th Cir. 2011) (indirect showing is made if defendant "is shown to have market power and to have adopted policies *likely* to have an anticompetitive effect"). An indirect showing entails proof of "market power, plus some other ground for believing that the challenged behavior could harm competition in the market." *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 97 (2d Cir. 1998). The district court made all of the necessary findings under the indirect approach; AA does not challenge these findings and cannot avoid them.

### 1. The District Court Applied Well-Established Precedent in Finding that Defendants Had Market Power.

Market power can be established either through proof that defendants have a "sufficient percentage share of a 'relevant market'" and that there are barriers to entry, *E. Food Servs., Inc. v. Pontifical Cath. Univ. Servs. Ass'n, Inc.*, 357 F.3d 1, 6 (1st Cir. 2004), or alternatively, through "evidence of specific conduct undertaken by the defendant that indicates he has the power to affect price or exclude competition," *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 239 (2d Cir. 2003). The district court's findings satisfied both paths. ADD85-87.

40

AA does not meaningfully dispute the court's findings as to market shares and barriers to entry, nor can it. As to market shares, Defendants' own calculations demonstrated that even with Newark included as a New York airport, as Defendants advocated, the NEA's shares ranged from 30 to 96% on numerous NEA routes—the relevant markets in this case—far surpassing the threshold for market power. 2-JA1295; *see Visa*, 344 F.3d at 240 (MasterCard member banks' 26% share of highly concentrated market was "sufficient to sustain a finding of market power").[6] AA does not contest the district court's finding of barriers to entry either; rather, AA agrees with it. Br. 6-8.

Instead, AA claims Defendants' commanding market position was immaterial because Delta and United allegedly could "undercut any price increase by expanding their output." Br. 41. But the district court found otherwise: Slot and gate limitations "block[ed] other carriers," including Delta and United, "from constraining harms flowing from the

---

[6]    *Amicus* Chamber of Commerce's suggestion (Chamber Br. 14-16) that the district court did not find market shares on specific routes is not properly before this Court, *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 33 n.10 (1st Cir. 2020), and is incorrect. The district court credited Dr. Miller's route-level analysis of concentration, ADD79 n.80—which AA concedes "turned on" market shares, Br. 43.

41

[NEA]." ADD78-79. Defendants had "exerted control over prices in the past" notwithstanding Delta's and United's ability to respond. ADD84-85. And the court found that Defendants' joint decisions about whether JetBlue should serve a market "are exercises of market power" given the JetBlue Effect, which existed even in markets including Delta and United, ADD22 & n.13; ADD86 n.88.

AA also overlooks that there are two ways to prove market power, and the district court found market power through *both* of them. AA's opening brief addresses only the court's market-share analysis, without even acknowledging the court's finding that Defendants' specific conduct demonstrated that they had "exerted control over prices in the past." ADD85-86.[7] That forfeiture alone is fatal to AA's market-power argument.

As a last-ditch argument, AA criticizes the district court for referring to the "power to *influence* prices." Br. 42. But that is a

---

[7]    For example, in May 2019, AA attempted to raise its fares systemwide but had to reverse the increase in markets where JetBlue did not increase its own fares. 3-JA1615 (cited at Dkt. 325 ¶ 33, in turn cited at ADD22). JetBlue, meanwhile, successfully raised prices on JFK-San Diego when AA exited the market. *See* p. 8, *supra*; ADD22; 5-JA2879; 1-JA224-26.

common way to define market power in Section 1 cases. *See, e.g.*, *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 452 n.10 (7th Cir. 2020); *Visa*, 344 F.3d at 239.

### 2. The District Court Correctly Found that the NEA Threatened to Harm Competition.

The district court correctly held that Plaintiffs satisfied the other requirement of the indirect method of proof: "some evidence that the challenged restraint harms competition." *Amex*, 585 U.S. at 542. Unlike the direct approach, the indirect method of proof also reaches "*threatened* effects" on competition. *Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 49 (1st Cir. 2001) (emphasis added); *see Addamax*, 152 F.3d at 53; *accord Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983 (9th Cir. 2023); *Impax Lab'ys, Inc. v. FTC*, 994 F.3d 484, 493 (5th Cir. 2021); *Realcomp*, 635 F.3d at 827.

**a.** To begin, the court's direct-evidence discussion identified numerous anticompetitive effects of the NEA—eliminating Defendants' head-to-head competition, weakening JetBlue as a maverick competitor, and allocating markets—that surely satisfy the indirect approach. Each of these anticompetitive practices is likely, in the presence of market power, to raise prices and decrease output. Eliminating competition

43

between two significant competitors with combined market shares as high as 96% and a history of fierce competition on price and output is likely to affect both. *See Lexington Bank*, 376 U.S. at 672-73; *JetBlue Airways*, 2024 WL 162876, at *27. Restraining a maverick likewise tends to drive prices up by reducing competitive pressure on other firms. *H&R Block*, 833 F. Supp. 2d at 80; *JetBlue Airways*, 2024 WL 162876, at *28. And market allocation "always or almost always tend[s] to restrict competition and decrease output." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (quotation marks omitted).

The district court also found that the NEA's revenue sharing created upward pricing pressure, relying on both Dr. Miller's opinion and the court's independent assessment. ADD56. Dr. Miller explained that before the NEA, if JetBlue had raised fares on a route where it competed with AA, some customers would have switched to AA or chosen not to fly at all. 1-JA663. But under the NEA's revenue-sharing arrangement, JetBlue financially benefited from AA's sales. 1-JA664. Thus, price increases that were not profitable for Defendants before the NEA became profitable under the NEA, *id.*, giving Defendants an

incentive to raise prices similar to that after a merger, 1-JA661-62. Dr.
Miller used an economic model to simulate and quantify the harm that
this upward pricing pressure would cause in nonstop overlap markets,
1-JA678-80, calculating upward pricing pressure of at least $627 million
annually, suggesting significant consumer harm, 1-JA691-92. Finally,
the NEA "fortif[ied] the barriers to outside competition" in the
Northeast by limiting each Defendant's ability to "transfer slots to
competing carriers." ADD79; *see N. Am. Soccer League, LLC v. United
States Soccer Fed'n, Inc.*, 883 F.3d 32, 42-43 (2d Cir. 2018) (plaintiff
"indirectly established an adverse effect" by showing that the
challenged restraints "impose[d] increasingly significant barriers to
entry") (citation omitted; quotation marks omitted).

     **b.**    AA asserts that the harms the court identified do not count
under the indirect approach because they do not satisfy the direct
approach, but that circular assertion makes little sense. Even if the
evidence the Court relied on for finding direct effects were insufficient,
the question under the indirect approach was whether the restraints in
the NEA (eliminating competition, sharing revenue, allocating markets
and take-off times), the economic evidence of upward pricing pressure,

and the competitive dynamics suggested likely harm to competition given Defendants' market power. They plainly did.

If the indirect approach required proof of actual effects satisfying the direct approach, the indirect approach would serve no function. Proving likely anticompetitive effects is also how government enforcers fulfill their statutory duty to "prevent" Section 1 violations. 15 U.S.C. § 4; *id.* § 26 (states can seek to enjoin "threatened loss or damage by a violation of the antitrust laws").

**c.**     AA's attacks on the district court's finding of upward pricing pressure are equally meritless. The record undercuts AA's claim that the district court never determined whether prices would "likely" increase. Br. 18. Dr. Miller testified, and the court agreed, that consumers were "*likely* to pay higher prices for flights" as a result of the NEA, Dkt. 307 at 92:15-93:2 (emphasis added); ADD56; *see* 3-JA1789. The court did not decide whether the specific dollar amount of increased fares Dr. Miller predicted was correct, Br. 37, because it did not need to do so. The NEA's likely price increases were a likely anticompetitive effect irrespective of their precise magnitude. *See Sullivan*, 34 F.3d at 1101 (restraint likely harmed competition because it tended to

"depress[] the price of ownership interests in NFL teams"); *cf. United States v. Anthem, Inc.*, 855 F.3d 345, 362 (D.C. Cir. 2017) (merger "potentially harm[ed] consumers by creating upward pricing pressure"); *JetBlue Airways*, 2024 WL 162876, at *17 (enjoining merger that would eliminate "Spirit's downward pressure on other airline[s'] prices").

AA lastly suggests that likely price increases are irrelevant even to an indirect showing of anticompetitive harm, Br. 37, but its authorities do not support such a rule. In *Tops Markets*, the challenged conduct did not have a likely effect on prices at all. 142 F.3d at 97. And *Amex* and *Procaps S.A. v. Patheon, Inc.* considered only whether plaintiffs had made out direct-evidence cases. *Amex*, 585 U.S. at 542 n.6; *Procaps*, 845 F.3d 1072, 1084 (11th Cir. 2016).

## C. AA's Contrary Arguments Lack Merit.

Rather than trying to show error in the district court's factual findings that the NEA caused many types of anticompetitive effects, AA argues that the court erred as a matter of law in crediting them. Its arguments are illogical and inconsistent with established precedent.

### 1.    No Special Rules Immunize Agreements Labeled "Joint Ventures."

AA first contends that the district court should have reviewed the NEA more deferentially. "[J]oint ventures," it argues, "must be carefully analyzed" because they are "not usually unlawful." Br. 34 (quotation marks omitted). And in the joint venture context, AA suggests, obvious restraints on competition—such as reducing firms' head-to-head rivalry, coordinating output, and allocating markets—are no longer cognizable anticompetitive effects because such features are "inherent to joint ventures." Br. viii. AA is wrong on both counts.

First, no special or different legal standard applies to joint ventures. The Supreme Court made that clear in *NCAA v. Alston*, which rejected the NCAA's claim that it was entitled to "foreshortened review" of its restraints on student-athlete compensation because it was a joint venture. 594 U.S. at 88. Joint ventures, *Alston* held, are not subject to any special rule-of-reason analysis. *Id.* This Court has similarly explained that a joint venture is not "'per se' legal"; on the contrary, "[a]ny joint venture, especially one that involves competitors, tends to be susceptible to attack under [the] rule of reason." *Addamax*, 152 F.3d at 52.

48

The Sherman Act "is aimed at substance rather than form." *Copperweld,* 467 U.S. at 760. Thus, the substance of a joint venture guides the analysis. *Id.* Some joint ventures are analogous to cartels and flatly condemned. *See Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 597-98 (1951), *overruled on other grounds by Copperweld*, 467 U.S. 752. And others are like mergers and analyzed as such. *See United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 173 (1964). Firms cannot evade proper review "by labeling the[ir] project a 'joint venture.'" *Timken*, 341 U.S. at 598.

Second, the scope of cognizable anticompetitive effects is not limited simply because a joint venture is involved. As the Supreme Court has explained, any horizontal agreement among actual or potential competitors[8]—including a joint venture—is "fraught with anticompetitive risk" because it "deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands." *Copperweld*, 467 at 768-69; *see Constr. Aggregate Transp.,*

---

[8]    Horizontal restraints are "agreement[s] among competitors on the way in which they will compete with one another," *Bd. of Regents*, 468 U.S. at 99, and vertical restraints are "those imposed by agreement between firms at different levels of distribution," *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988).

*Inc. v. Fla. Rock Indus., Inc.*, 710 F.2d 752, 778 n.48 (11th Cir. 1983)
(horizontal agreements "threaten the achievement of antitrust goals by
eliminating competition among the participants and thereby allowing
them to enhance their collective profits to the detriment of consumers").
It is likewise bedrock law that an agreement that "impedes the ordinary
give and take of the market place" on price and output is
anticompetitive "[o]n its face," *Pro. Eng'rs*, 435 U.S. at 692-93, and that
market-allocation agreements serve "no purpose except stifling
competition," *Palmer*, 498 U.S. at 49 (citation omitted). "Far from being
'presumptively legal,' such arrangements are exemplars of the type of
anticompetitive behavior prohibited by the Sherman Act." *Visa*, 344
F.3d at 242; *see* FTC & DOJ, *Antitrust Guidelines for Collaborations
Among Competitors* § 2.2 (2000), https://www.ftc.gov/sites/default/files/
documents/public_events/joint-venture-hearings-antitrust-guidelines-
collaboration-among-competitors/ftcdojguidelines-2.pdf (noting that
competitor collaborations harm competition if they "limit independent
decision making" or "otherwise reduce the participants' ability or
incentive to compete independently").

To be sure, many joint ventures are lawful. The participants may have sufficiently small market share that their venture is unlikely to impair competition. *Alston*, 594 U.S. at 88 (citing *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 217 (D.C. Cir. 1986), involving a joint venture that "command[ed] between 5.1 and 6% of the relevant market"). Or ventures may lack anticompetitive effect because they "allow the[] partners to continue to compete with each other in the relevant market." *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 963 (10th Cir. 1994) (quotation marks omitted). Or, at subsequent steps under the rule of reason, the participants may prove that the venture has procompetitive benefits that cannot "be reasonably achieved through less anticompetitive means." *Alston*, 594 U.S. at 97 (citation omitted).

The NEA, however, was not so innocuous. Defendants were "significant market participants" with substantial market shares in numerous relevant markets, ADD90, 91 n.95, and the NEA eliminated *all* competition between them in those markets, ADD38. That is prima facie anticompetitive by any conceivable standard. *Bd. of Regents*, 468 U.S. at 107; *Lexington Bank*, 376 U.S. at 672-73; *Penn-Olin*, 378 U.S. at

51

173 (joint venture could harm competition by "eliminat[ing] . . . any prospect of competition between" its owners).[9]

Moreover, by changing the incentives of a "particularly aggressive competitor in a highly concentrated market"—JetBlue—the NEA caused additional harm. *Aetna*, 240 F. Supp. 3d at 43 (citation omitted). The alliance not only reduced JetBlue's competition with AA but also reduced JetBlue's ability to compete with Delta and United. ADD48, ADD80-81. AA downplays the district court's finding, insisting there was no evidence JetBlue raised prices. Br. 38. But the district court found that the NEA increased JetBlue's operating costs and caused it to lose out on opportunities to grow at Heathrow and Newark, ADD46-47, all of which the court found "diminish[ed] JetBlue's ability to provide disruptive, low-cost competition to the [legacies] in the northeast," ADD48.[10]

---

[9]     In a merger case, this loss of competition would be called a "unilateral effect[]." *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 569 (6th Cir. 2014). It is a well-established type of anticompetitive harm. *Id.*

[10]     AA's responses to JetBlue's loss of growth opportunities lack merit. It notes that "JetBlue found other slots" at Heathrow, Br. 38, but the district court found JetBlue did so on much "less favorable" terms than the remedy slots offered. ADD47 & nn.50-51. And although AA

In sum, AA's claim that the decision below condemns "even the most welfare-enhancing collaborations" is fiction. Br. 4. Indeed, the court declined to enjoin future alliances between Defendants and other airlines—even ones "substantially similar" to the NEA—on the premise that those hypothetical ventures might be lawful. Dkt. 373 at 3. The district court held that the NEA, and only the NEA, was anticompetitive and unlawful.

> **2.   The Rule of Reason Does Not Ignore Evidence of Harm to Competition Other than Measured Price and Output Effects.**

AA next seeks to downplay the district court's findings of powerful anticompetitive harm for want of "empirical[]" proof regarding price and output before and after the NEA. Br. 25, 32-33. In AA's view, the only way a plaintiff can show anticompetitive harm is by demonstrating that a restraint has already caused "anticompetitive prices or a reduction of output." Br. 32. Even on that inappropriately narrow view, Plaintiffs made out a prima facie case given the district court's finding that the

---

argues that Heathrow is not in the Northeast, Br. 38, that fails to address the court's finding that JetBlue lost Newark slots and overlooks that JetBlue would have used the Heathrow slots to serve London from Boston. ADD47; ADD80-81; 1-JA148; 5-JA3018-19; 5-JA3503-04.

NEA decreased output in a number of key relevant markets. *See* pp. 13, 26, *supra*. But the argument is also fundamentally flawed because it unduly narrows the flexible rule of reason, asking courts to ignore many other types of evidence of anticompetitive harm, such as eliminating head-to-head competition, reducing consumer choice, or limiting a maverick's capability to disrupt markets. Each of those harms consumers and is squarely cognizable under the antitrust laws.

AA's proposed standard ignores the way the Act protects consumers—competition. The Sherman Act was "aimed at preserving free and unfettered competition as the rule of trade." *N. Pac. Ry.*, 356 U.S. at 4. Congress concluded that the "unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conductive to the preservation of our democratic political and social institutions." *Id.* It sought to ensure that free market competition, rather than regulators or courts, would determine how economic resources were allocated and what prices were charged.

Thus, Congress did not instruct courts to determine the best allocation of resources in our economy by measuring and optimizing the results of competition themselves. Rather, "Congress tasked courts with enforcing a policy of *competition* on the belief that *market forces* yield the best allocation of the Nation's resources."[11] *Alston*, 594 U.S. at 73 (emphasis added; citation omitted); *Fishman v. Estate of Wirtz*, 807 F.2d 520, 536 (7th Cir. 1986) ("The antitrust laws are concerned with the competitive *process*, and their application does not depend in each particular case upon the ultimate demonstrable consumer effect."). By protecting competition, courts maximize benefits to the public. *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 489 (2d Cir. 2004) (the antitrust laws "safeguard consumers by protecting the competitive process," "which fosters innovation and tends to lower prices for consumers"); *see Visa*, 344 F.3d at 240 ("total exclusion" of two competitors from the market meant that "price and product competition

---

[11]     Congress did this by expressly invoking in Section 1 the common law on "restraints of trade." *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 58 (1911); *accord Amex*, 585 U.S. at 540. The common law prohibited "all contracts or acts which were unreasonably restrictive of competitive conditions" because they could result in "enhancement of prices [or] other wrongs." *Standard Oil*, 221 U.S. at 58.

is necessarily limited"). And harming competition axiomatically reduces consumer welfare.

The question in Section 1 rule-of-reason cases is therefore "whether the challenged agreement is one that promotes competition or one that suppresses competition." *Pro. Eng'rs*, 435 U.S. at 691. Courts have looked to a wide range of factors to answer that question, "consider[ing] the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable," including the restraint's "history," and "the purpose or end sought to be attained." *Bd. of Trade*, 246 U.S. at 238; *see Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 781 (1999) ("What is required" under the rule of reason is "an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint.").

Under this flexible, common-sense approach, numerous courts have found harm to competition through means other than already-occurring higher prices or reduced output. *See, e.g.*, *IFD*, 476 U.S. at 462 (restraint on dentists' provision of X-rays could "be condemned even absent proof that it resulted in higher prices" for dental services "than

would occur in its absence"); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937

(7th Cir. 2000) (manufacturers' agreement not to supply toys to

warehouse clubs had an anticompetitive effect by reducing price

competition); *United States v. Brown Univ.*, 5 F.3d 658, 674 (3d Cir.

1993) ("[A]ctual dollar amount effects do not necessarily reflect the

harm to competition which Congress intended to eliminate in enacting

the Sherman Act.").

For example, in *Sullivan*, this Court held that an NFL rule

prohibiting public sales of shares in teams could "injure[] competition

by making the relevant market 'unresponsive to consumer preference,'"

"regardless of [its] exact price effects." 34 F.3d at 1101 (quoting *Bd. of

Regents*, 468 U.S. at 107). And in *Board of Regents*, the Supreme Court

found it "mo[re] significant" under the rule of reason that a restraint

made price and output unresponsive to consumer preference than that

the restraint had specific price or output effects. 468 U.S. at 107.

AA claims *Amex* supports ignoring evidence other than observed

changes in price and output, Br. 32-33, but that reading is refuted by

the plain language of the opinion. *Amex* provided numerous examples of

actual anticompetitive effects beyond changes in price and output—

57

including evidence that a restraint "decreased quality," *or* "otherwise stifled competition." 585 U.S. at 542, 547; *see also id.* at 551 (plaintiffs failed to prove challenged provisions stifled competition in part because there was "nothing inherently anticompetitive" about the vertical restraints). *Amex* relied in turn on two circuit court cases, which both recognized that such evidence is not limited to observed price and output effects. *See id.* at 542, 547; *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380, 390 (8th Cir. 2007) ("decrease in the total number of competitors," "stifling industry research," or other "detrimental effects upon the competitive *process*" (emphasis added)); *Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 257 F.3d 256, 264-65 (2d Cir. 2001) ("higher quality services" available when a new airline entered the market).

Indeed, antitrust defendants have advocated AA's reading of *Amex* in another circuit and failed. In *US Airways, Inc. v. Sabre Holdings Corp.*, the Second Circuit expressly rejected the rigid reading of *Amex* that AA sets forth here: "The use of the disjunctive—'or'—in these statements of law by the Supreme Court contradicts Sabre's assertion that [observable price and output effects] had to be established." 938

58

F.3d 43, 63 (2d Cir. 2019). For this reason, the Second Circuit accepted actual, non-price harms, including heightened barriers to entry in the relevant market, reduced quality, and "technological stagnation." *Id.* at 62. Far from adhering to precedent, then, AA's approach is exactly the sort of "inflexible substitute for careful analysis" that the Court has condemned. *Alston*, 594 U.S. at 97.

AA relies on *MacDermid Printing Solutions LLC v. Cortron Corp.*, for the proposition that a plaintiff must show "actual harm to consumers" under the indirect approach. Br. 28, 32, 39. *MacDermid*, however, acknowledged that an indirect showing can rest on evidence that a restraint is "inherently anticompetitive"—for example, by "reduc[ing] consumer choice." 833 F.3d 172, 183 (2d Cir. 2016). AA fares no better in parroting *MacDermid*'s statement that the Second Circuit had not yet found anticompetitive harm without measurable price or output effects. Br. 39. Two years after *MacDermid*, the Second Circuit did just that, holding that the plaintiff "indirectly established an adverse effect" by showing that the challenged restraints "impose[d] increasingly significant barriers to entry." *N. Am. Soccer League*, 883 F.3d at 43 (citation and quotation marks omitted).

AA's proposed rule requiring "empirical[]" proof, Br. 25, is not just wrong as a legal matter; it makes no sense as a matter of antitrust policy and judicial administration. Even in the best of times, it can be "difficult[]" or even "impossible" "[to] isolat[e] the market effects of challenged conduct" on price and output data. *Brown Univ.*, 5 F.3d at 668. For example, an apparently constant price over time may mask anticompetitive harm if competition would have lowered that price absent an unlawful restraint. And in cases like this, the parties' conduct is "subject to manipulation" during investigation and litigation. *See Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 435 (5th Cir. 2008). Moreover, confounding factors can make the task of tracing price and output effects to a restraint even harder. That was the case here, where the NEA's implementation during the COVID-19 pandemic and recovery threw off the data. *See* pp. 67-68, *infra*. It is absurd for AA to suggest a legal standard that requires price and output evidence that is often unavailable or uninformative, while ignoring evidence on which courts have long relied.

Finally, AA's proposed requirement of *backward-looking* price and output effects renders the indirect method of proof meaningless,

60

contrary to *Amex* and AA's own admissions that *likely* effects are enough. Br. 3 ("actual or likely adverse effects" are required). Plaintiffs proved likely harm to price and output here in several ways, *see* pp. 33-39, 43-45, *supra*, and thus satisfied their burden even if price and output effects were required.

### 3.    The District Court Did Not Conduct a "Quick Look."

AA's passing suggestions that the district court's analysis amounted to a "quick look," Br. 30, are wrong. The district court did not truncate its inquiry. It identified relevant product and geographic markets, ADD84-85, it found that Defendants had market power in numerous relevant markets, ADD85-86, it found anticompetitive harm based on both direct and indirect evidence, ADD76-88, it carefully examined Defendants' justifications for the NEA, ADD87-99, and it made factual findings about less restrictive alternatives and the ultimate balancing of harms and benefits. ADD99-101. That is a full rule-of-reason analysis. To be sure, the district court said that "no deep and searching analysis is required in order to discern [the NEA's] unlawfulness"—but that comment only underscores how badly the NEA

flunked this full rule-of-reason test. ADD76; *cf. Visa*, 344 F.3d at 243 (defendants lost at step two of the full rule of reason).[12]

## II.    The District Court Correctly Concluded that Defendants Failed to Prove that the NEA Benefited Competition.

Because the district court found substantial anticompetitive harm at step one, Defendants bore a "heavy burden" to prove that the NEA produced procompetitive benefits. ADD88 & n.91; *see Bd. of Regents*, 468 U.S. at 113. But even after the court gave Defendants every chance to carry that burden, it found that they had failed. ADD88.

At this point, Defendants needed to show that their restrictions on competition "ha[d] a[] direct connection to consumer demand." *Alston*, 594 U.S. at 83. But the district court found that the evidence cut decisively against Defendants. Neither Defendants' own witnesses nor their ordinary-course documents provided any basis to conclude that NEA had more than a "de minimis" procompetitive impact. The district

---

[12]    Even if the district court *had* abbreviated its rule-of-reason inquiry, that would have been appropriate. Courts have applied quick-look, or even per se, analysis to facially anticompetitive restraints imposed by joint ventures, including market-allocation, capacity-coordination, and revenue-sharing agreements. *See, e.g.*, *Bd. of Regents*, 468 U.S. at 109; *Citizen Pub.*, 394 U.S. at 135; *Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 37 (D.C. Cir. 2005); *Chi. Pro. Sports Ltd. P'ship v. NBA*, 961 F.2d 667, 676 (7th Cir. 1992).

court found that the airlines had not shown they "added new flying they could not have otherwise pursued," ADD98; on the contrary, they already had plans to grow significantly before the NEA. The evidence similarly demonstrated that the fleet growth Defendants claimed was not directly related to the NEA. ADD95. And Defendants had not shown that the NEA made them more attractive to customers or more competitive with Delta and United. ADD89-95.

Instead of challenging the district court's extensive factual findings as clearly erroneous, AA simply ignores them and repeats its rejected narrative from trial. It claims that the NEA "increase[d] output," Br. 47—even though the court found otherwise, ADD95-98. And AA claims the NEA was "premised on" the airlines expanding output in the Northeast, "thereby making them more attractive to, and benefiting, consumers," Br. 45—even though the court found that that was "simply not a fair characterization of the NEA's 'underlying purpose'" or of its marketplace effect. ADD89. By failing to challenge the district court's findings, AA has waived any argument that they are clearly erroneous. *Yaman v. Yaman*, 730 F.3d 1, 9 n.10 (1st Cir. 2013).

In any event, the district court's well-supported factual findings are correct, and those findings refute AA's claims of procompetitive effects.

Having lost on the facts, AA tries to argue the law, claiming that the district court's decision at step two "was not rooted in any relevant fact-finding, but rather in the legal conclusion" that any benefits were noncognizable. Br. 45. Not so. The district court acknowledged that some joint ventures may allow the participants to become more effective competitors together. ADD72. But it rightly observed that Defendants could not transform the *anticompetitive* effects of their alliance— including capacity coordination and market allocation—into procompetitive benefits by simply relabeling them as such. It was incumbent on Defendants to show that their becoming larger and more powerful actually made consumers better off. The district court found they did not do so. Having factually rejected Defendants' claims of consumer benefits, the district court committed no legal error in rejecting Defendants' "bigger-is-necessarily-better" rationale.

## A. Defendants' Claimed Benefits Failed for Lack of Evidence.

Defendants completely failed to carry their burden to show that their agreement enhanced competition. They relied primarily on a

flawed economic model from an uncredible defense expert, which the
district court properly discounted. ADD59-61. Nor did AA and JetBlue
otherwise substantiate their claimed benefits in capacity, fleet size,
routes, "optimization" of schedules and bigger networks, and frequent
flyer programs. ADD95-99.

      **1.**    *Discredited Expert Testimony.* The centerpiece of
Defendants' benefits case was an economic model proposed by Dr.
Israel, a prolific defense expert in antitrust cases. He purported to
compare the world with and without the NEA and determine the
difference in passenger traffic between the two scenarios. ADD60, 2-
JA781. He then translated that difference into a dollar value, which he
offered as an estimate of the competitive benefits resulting from the
NEA. 2-JA783-84.

      The district court completely rejected Dr. Israel's testimony for
two reasons. ADD61. First—as AA nowhere acknowledges—the court
found that Dr. Israel's analysis was substantively unreliable. ADD60.
Agreeing with Plaintiffs' expert, Dr. Robert Town, the court found that
Dr. Israel's two scenarios failed to compare apples to apples. His "no-
NEA" scenario looked at Defendants' fleets and service in 2019, while

the NEA scenario included additional aircraft Defendants already

expected to receive by 2023. ADD60 n.67. Dr. Israel's scenarios also

depended on the assumption that the world of air travel would return to

pre-pandemic conditions—an assumption the court found was wrong.

ADD60. This uninformative comparison was "devised by the

defendants" for litigation. *Id.*

Second, the district court found Dr. Israel (like Defendants' other

experts) not credible. On the stand, Dr. Israel exhibited "the demeanor

and tone of an advocate invested in the outcome of this case." ADD57.

Dr. Israel had also worked for AA and other legacy airlines many times

without ever rendering an opinion adverse to them in an antitrust case.

ADD56-57; Dkt. 311 at 92-93. This credibility determination

undermined a key pillar of Defendants' step-two showing.[13]

**2.**    *Seat Capacity*. The district court found that the NEA did not

cause AA and JetBlue to "add[] new flying they could not otherwise

---

[13]    Other courts have similarly found Dr. Israel's analyses unreliable.
*See Anthem*, 855 F.3d at 364 (concluding that Dr. Israel's benefit
projections "fall to pieces in a stiff breeze"); *accord FTC v. IQVIA
Holdings Inc.*, 2024 WL 81232, at *31 (S.D.N.Y. Jan. 8, 2024); *FTC v.
Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 65 n.14 (D.D.C.
2018).

have pursued." ADD98. AA and JetBlue claimed that they could meet
their burden simply by showing a difference in capacity "before and
after the restraint was imposed." Dkt. 322-1 at 45. But correlation is not
causation: Defendants' rebuttal burden was to establish that *the NEA*
increased output. *See, e.g.*, *Alston*, 594 U.S. at 99 (noting that defendant
had to show that the challenged restraints "yield a procompetitive
benefit" and that it largely failed to do so because it did not show the
restraints "have any direct connection to consumer demand"); *Bd. of
Regents*, 468 U.S. at 114 (asserted benefit to marketability of broadcast
rights was not cognizable given finding that "NCAA football could be
marketed just as effectively without the [challenged restraint]").

Defendants' evidence did not meet their burden; in many respects,
the evidence *contradicted* their position that the NEA caused capacity
increases. The NEA took effect in January 2021, before air travel had
recovered from its collapse at the outset of the COVID-19 pandemic.
ADD38. As the country reopened, airline capacity returned across *all*
airlines and demand patterns changed from before the pandemic.
ADD21; 5-JA3421. The mere fact that airline capacity in 2021 and 2022

67

changed as the industry rebounded from the depths of the pandemic says nothing about whether the NEA increased capacity.[14]



**Exhibit 23**
**Percent Change in Capacity Relative to September 2018**
Domestic Routes at NEA Airports

5-JA3423.[15]

---

[14]    AA's repeated statements that the number of daily flights went up on Boston-LaGuardia, Br. 11, 17, 32, 48, are wrong. The district court found the opposite: although the court noted evidence that *JetBlue's* number of flights on that route would eventually increase, ADD94 n.99, on the relevant question it found that Defendants' *combined flights* on the route decreased due to AA's exit, ADD44.

[15]    AA wrongly asserts that Plaintiffs "conceded" that capacity increased. Br. 17. Plaintiffs' experts simply did not opine on that question, which was Defendants' burden at step two. 2-JA717 ("I have not analyzed [Defendants'] schedules."); 1-JA599 ("I don't offer a view on that.").

The district court also found Defendants had not proved a causal connection between the NEA and any increased capacity because both airlines had planned to grow substantially in Northeast markets *before* the NEA. ADD53-54. For instance, AA had planned to upgauge its jets in New York and to lease New York slots to JetBlue for increased flying. ADD96 n.104. These pre-NEA plans further undercut Defendants' attempt to attribute capacity changes to the NEA. ADD96.

AA complains, wrongly, that such growth that would have occurred anyway must only be considered at step three as a less restrictive alternative. Br. 51-52. If a restraint does not enable firms to compete more effectively than they would without it, it fails at step two. *See Alston*, 594 U.S. at 99-100; *Bd. of Regents*, 468 U.S. at 114. In any event, as explained below, the district court *did* proceed to step three and found that a less restrictive alternative would have achieved the increased capacity Defendants claimed. ADD100-01.

The district court additionally observed that any capacity changes at NEA airports came "at the expense of resources and output elsewhere." ADD96. AA dismisses this as "conjecture[], without evidence," Br. 51, but it was not: the district court found that

Defendants had moved planes from other markets to NEA routes. ADD40. Indeed, AA's own employees admitted that AA was "robbing Peter to pay Paul" in this way. 2-JA822 (AA's vice president of network strategy); *see* ADD40 (citing AA executive's testimony); 2-JA810. JetBlue similarly moved assets around, forgoing flying elsewhere to operate NEA flights. ADD40; *see, e.g.*, 1-JA393-95, 1-JA592, 5-JA2982.

This shell game was yet another reason why Defendants' proof of causation failed. The court noted reasons why Defendants' moving aircraft likely had nothing to do with increasing competition—in particular, Defendants' commitments to DOT incentivized them to "artificially inflate capacity in the [New York] airports" so they could meet their growth targets and avoid having to divest additional slots. ADD101 n.113; *see also* ADD41 n.43. Thus, the district court did not rely on out-of-market harm to reject Defendants' growth claims, as AA claims. Br. 50-51.[16]

---

[16]    AA's suggestion that the markets from which Defendants pulled planes "may have had excess capacity," Br. 51 n.14, is thus irrelevant— and wrong. The court found these markets were ones where Defendants planned to *grow* before the NEA. ADD40.

Finally, because AA's and JetBlue's output on NEA routes "could arguably be subject to manipulation"—whether to avoid additional divestitures or to improve their litigating position—the district court rightly "deemed" their conduct while under investigation and in litigation "of limited value." *Chi. Bridge*, 534 F.3d at 435; *see Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1384 (7th Cir. 1986) (factfinder can discount a "post-acquisition transaction" that "may have been made to improve [the defendant's] litigating position").

AA faults the district court for not deciding whether Defendants "could have achieved *all* of" the claimed capacity growth without the NEA, Br. 51, but it was Defendants' burden at step two to show which capacity increases—if any—were caused by the NEA, *see Alston*, 594 U.S. at 99, and the court found they did not meet it. Given that unchallenged finding, AA's claim that the district court "did not resolve whether" Defendants' purported output increase "was caused by the NEA" is simply false. Br. 17 n.5. The court decided that issue, emphatically, against Defendants.

**3.**    *Fleets*. The district court next found that Defendants had "claimed, but not proven, that their fleets have actually grown as a

71

result of the NEA." ADD95. The aircraft retirements JetBlue purportedly delayed so it could fly NEA routes would have been delayed anyway. ADD41 n.44. And AA's own witness could not attribute AA's fleet decisions to the NEA. 2-JA825-826.

    **4.**   *Routes.* Nor did Defendants prove that any new routes at NEA airports were attributable to the alliance. The district court explained that other factors, such as pandemic-related shifts in travel patterns or the "long-term plans" Defendants "would have pursued without the NEA," were equally plausible explanations. ADD96-98.[17]

    **5.**   *"Optimization" of Schedule and Network.* The district court rejected Defendants' attempts to "cast" their schedule "optimization"— i.e., their allocation of markets and agreement "not [to] offer directly competing flights"—as a procompetitive benefit. ADD44 & n.45. The

---

[17]    The new routes purportedly established from NEA airports were not cognizable at step two in any event. The Sherman Act does not authorize courts to "sacrifice competition in one portion of the economy for greater competition in another portion." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 611 (1972). Thus, an anticompetitive effect or procompetitive benefit is only cognizable to the extent it occurs "in the relevant market itself." *Sullivan*, 34 F.3d at 1113. Here, any benefit from "new routes" accrued *outside* the relevant markets where the NEA harmed competition: a new flight from JFK to Tel Aviv does nothing to benefit travelers harmed by the loss of Defendants' competition on Boston-LaGuardia.

court found no evidence that passengers wanted this competition-minimizing schedule, and the evidence suggested they did not. The district court found that Defendants' "optimization" left customers on particular routes or "fly[ing] at a particular time of day [with] fewer carriers from which to choose." *Id.* That was harmful to passengers, especially "on business routes . . . where corporate travelers might need to arrive or depart at specific times." ADD44 n.45.

Likewise, while Defendants touted a bigger "network," the district court found that "neither the record nor the Court's own experience suggested that" the relevant product for individual customers was the network; rather, customers purchase "a ticket for a flight (or flights) from one place to another." ADD93 n.97. The court found that the NEA did not "revolutionize[] that 'product' in any way," *id.*; Defendants "ha[d] not established their pooled assets are 'complementary' such that they enable the defendants to create an innovative product." ADD93. As to corporate customers, there was "no significant evidence the defendants were losing corporate accounts before the NEA or ha[d] gained new accounts because of it." ADD95 n.100. And although an improved network supposedly made Defendants more competitive with

73

Delta and United, the evidence of those airlines' competitive responses to the NEA was "milquetoast, at best." ADD95.

**6.** *Frequent-Flyer Benefits*. "All that remain[ed]," the district court noted, were the NEA's frequent-flyer benefits. ADD99. Yet the court found that, even assuming Defendants' frequent-flyer changes enhanced competition, any competitive benefit was "de minimis compared to the anticompetitive harms the Court ha[d] found." *Id.*; *see Bd. of Regents*, 468 U.S. at 113. And any benefit was "plainly achievable through less restrictive means" because airlines regularly offer frequent-flyer reciprocity without the many other competitive restraints in the NEA. ADD99 & n.112.

In sum, the district court found every claimed benefit of the NEA unsubstantiated or de minimis. Far from suggesting that "no joint venture c[an] ever be upheld," Br. 49, the district court expressly recognized that joint ventures may "justify ancillary restraints that otherwise appear anticompetitive" when such ventures actually promote procompetitive goals. ADD93. And the district court gave as one of its many examples of legitimate joint ventures "'two small companies' seeking to collaborate so that they can 'compete more

effectively with larger corporations dominating the relevant market.'"
ADD91 n.95. The district court simply found that Defendants' evidence
provided no support for, and even contradicted, their justifications.

### B. Benefits to AA and JetBlue Do Not Necessarily Inhere to Consumers.

The district court's factual findings establish that the NEA did not
make Defendants' product better; it simply made Defendants larger and
more powerful, which was only good for AA and JetBlue. Rather than
grapple with the court's findings, AA seeks to sidestep them, accusing
the district court of erroneously disregarding the NEA's benefits. But
what AA decries as "fundamental error," Br. 22, is actually
fundamental to our antitrust laws: they protect "competition"—*not* "the
interest of the members of an industry." *Pro. Eng'rs*, 435 U.S. at 692.

As AA elsewhere admits, to prove procompetitive benefits, it had
to show at step two that its agreement with JetBlue "*meaningfully*
improve[d] the *functioning of markets* by, for example, 'increasing
output, creating operating efficiencies, making a new product available,
enhancing product or service quality, and widening consumer choice.'"
Br. 44 (quoting *Law v. NCAA*, 134 F.3d 1010, 1023 (10th Cir. 1998)
(emphasis added)); *see, e.g.*, *Sullivan*, 34 F.3d at 1113 (justifications for

75

NFL policy were relevant to the extent they "result[ed] in increased competition in the market").

As the district court correctly observed, the functioning of markets is not improved merely by "making individual competitors larger or more powerful." ADD10; ADD94. To the contrary, the Sherman Act "exist[s] to protect the competitive process itself, not individual firms," *Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792, 794 (1st Cir. 1988) (Breyer, J.), and it deems the accumulation of market power a paradigmatic antitrust problem, *see* pp. 49-50, *supra*. Accordingly, firms may not use the "potential threat that competition poses" *to them* to justify restraining competition. *Pro. Eng'rs*, 435 U.S. at 695; *Law*, 134 F.3d at 1023 ("[M]ere profitability or cost savings have not qualified as a defense under the antitrust laws."). The notion that the "presence of a strong competitor justifies a horizontal [anticompetitive] conspiracy" is "a concept of marketplace vigilantism that is wholly foreign to the antitrust laws." *United States v. Apple, Inc.*, 791 F.3d 290, 298 (2d Cir. 2015).

For this reason, courts have time and again rejected arguments that restraints of trade eliminating one form of competition are justified

because they would allow defendants to "channel[] competition into [other] areas," *see Brown Univ.*, 5 F.3d at 675, or that a restraint frees the parties up to take on a leading firm, *see FTC v. H.J. Heinz Co.*, 246 F.3d 708, 720 (D.C. Cir. 2001); *H&R Block*, 833 F. Supp. 2d at 80. The district court did the same here, concluding that the Sherman Act did not "permit the elimination of competition between" AA and JetBlue, "two significant market participants, just so that [they] can unseat the market leader" by becoming bigger. ADD90-91.

In the same vein, the district court rejected Defendants' attempt to recharacterize their anticompetitive capacity coordination and market allocation as procompetitive justifications through labels such as "optimizing" and "better schedules." ADD94. These euphemisms simply described Defendants' "elect[ion] not to compete with one another[] and cooperate in ways that horizontal competitors normally would not." ADD95. *See Viamedia*, 951 F.3d at 479 ("[C]laimed benefits from [challenged] conduct must be procompetitive and not simply the result of eliminating competition."). Coordinating schedules and routes may have been better *for them*, but AA and JetBlue needed to establish that it was better *for customers*. The district court found they "produced

minimal objectively credible proof to support that claim." ADD13. That failure of proof, not any legal error, was the "root[]" of AA and JetBlue's loss. Br. 45.

## III.  Even if Defendants Had Carried Their Step-Two Burden, Affirmance Would Still Be Warranted.

Even if Defendants carried their step-two burden, the district court's findings on less restrictive alternatives and balancing would still require affirmance.

### A. The District Court's Unchallenged Finding of a Less Restrictive Alternative Independently Supports the Judgment.

The district court found that Plaintiffs showed a viable less restrictive alternative to the NEA: a WCIA-style alliance combined with slot leases in New York. ADD99-100. AA's only response is that given the district court's rejection of the NEA's benefits at step two, the court never determined whether this less restrictive alternative would yield the purported benefits of the NEA. Br. 53-54. That is wrong.

The district court found as a factual matter that whatever "objectives American and JetBlue sought to realize via the NEA could have been achieved" by its less restrictive alternative. ADD100. The court found that an alternative similar to the WCIA would have allowed

Defendants to "leverage any complementary aspects of their networks" and "use JetBlue's domestic traffic to feed American's international service." *Id.*; *see also* ADD52. Thus, even if the NEA *had* helped Defendants "better compete with Delta," a WCIA-style alliance would have achieved the same thing. ADD100. A slot lease from AA to JetBlue in New York, meanwhile, would have enabled the same growth there that the NEA purportedly did. *Id.* Although the district court noted that Defendants' failure of proof at step two made its job at step three especially easy, ADD101, its findings established that Defendants would lose at step three even if they had proved all their claimed benefits. AA does not challenge these decisive findings as clearly erroneous.

## B. The District Court's Unchallenged Weighing of Harms and Benefits Independently Supports the Judgment.

If no less restrictive alternative is shown, a court must proceed to "balance [a] restriction's anticompetitive harms against its procompetitive benefits." *Epic Games*, 67 F.4th at 994; *see Sullivan*, 34 F.3d at 1111; *Fraser v. Major League Soccer, LLC*, 284 F.3d 47, 59 (1st Cir. 2002); ADD73. The district court addressed this step as well, finding that the NEA's harms "overwhelmingly" outweighed its

benefits. ADD101. AA neither mentions nor challenges that conclusion, forfeiting any challenge to it. *See, e.g.*, *United States v. Reyes-Santiago*, 804 F.3d 453, 459 (1st Cir. 2015).

In any event, the district court correctly found that the NEA's harms far outweighed its benefits. The court found that the NEA caused "serious anticompetitive harm," ADD84, by eliminating the aggressive competition between Defendants; weakening JetBlue's incentive and ability to act as a maverick competitor; allocating markets; reducing consumer choice; lowering output on key NEA routes; and putting upward pressure on prices. All of this "substantially upset[] the competitive balance in a highly concentrated industry." ADD102.

By contrast, the district court's findings establish that any increase in competition from the NEA was negligible. The court found that without the NEA, both Defendants would have grown in the Northeast and "continu[ed] to occupy strong positions among the largest carriers in Boston and New York." ADD54; ADD91 n.95. The court also found that AA already had a global network comparable to Delta's and United's prior to the NEA and that the NEA did not increase the reach of that network because Defendants' assets were overlapping, rather

than complementary. ADD93; *see also* 3-JA2021-22. And finally, the court found minimal evidence of competitive responses by Delta and United to the NEA. ADD95. That left only "de minimis" frequent flyer benefits on Defendants' side of the ledger. *See* p. 74, *supra*.

The record thus demonstrates that the "principal tendency" of the NEA was to suppress competition in one of the country's most concentrated air travel regions. *Cal. Dental*, 526 U.S. at 781. That tendency made the NEA unlawful.

# CONCLUSION

This Court should affirm the district court's judgment.

Respectfully submitted.

March 5, 2024

JONATHAN S. KANTER
  *Assistant Attorney General*
DOHA G. MEKKI
  *Principal Deputy Assistant
  Attorney General*
HETAL J. DOSHI
  *Deputy Assistant Attorney
  General*
MICHAEL B. KADES
  *Deputy Assistant Attorney
  General*
DAVID B. LAWRENCE
  *Policy Director*
MARKUS A. BRAZILL
  *Counsel to the Assistant
  Attorney General*
WILLIAM H. JONES II
  *Counsel to the Director of Civil
  Litigation*

s/ *Matthew A. Waring*

PATRICIA C. CORCORAN
JAMES H. CONGDON
SCOTT L. REITER
JOHN J. SULLIVAN

DANIEL E. HAAR
NICKOLAI G. LEVIN
MATTHEW A. WARING
ALICE A. WANG
  *Attorneys*
U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave., N.W.
Room 3224
Washington, D.C. 20530-0001
(202) 532-4186
matthew.waring@usdoj.gov

*Counsel for Plaintiff-Appellee United States*

KRISTIN K. MAYES
*Attorney General*

<u>s / Robert Bernheim</u>
ROBERT BERNHEIM
(AZ Bar No. 024664)
Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, AZ 85004
(520) 628-6507
robert.bernheim@azag.gov

*Counsel for Plaintiff-Appellee State of Arizona*

ROB BONTA
*Attorney General*

<u>s / Robert B. McNary</u>
ROBERT B. MCNARY
California State Bar No. 253745
JAMIE L. MILLER
300 South Spring Street, Suite 1702
Los Angeles, California 90013
(213) 269-6283
robert.mcnary@doj.ca.gov

*Counsel for Plaintiff-Appellee State of California*

83

BRIAN SCHWALB
*Attorney General*

s/  *Adam Gitlin*
ADAM GITLIN

Office of the Attorney General for
the District of Columbia
400 Sixth Street NW, Tenth Floor
Washington, DC 20001
(202) 442-9853
adam.gitlin@dc.gov

*Counsel for Plaintiff-Appellee*
*District of Columbia*

ASHLEY MOODY
*Attorney General*

s/  *Colin G. Fraser*
COLIN G. FRASER (FL Bar No.
104741)

Office of the Attorney General
State of Florida
PL-01, The Capitol
Tallahassee, FL 32399
(850) 414-3300
Colin.Fraser@myfloridalegal.com

*Counsel for Plaintiff-Appellee State*
*of Florida*

ANDREA CAMPBELL
*Attorney General*

s / *William T. Matlack*
WILLIAM T. MATLACK
(MA Bar No. 552109)

Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200
William.Matlack@mass.gov

*Counsel for Plaintiff-Appellee*
*Commonwealth of Massachusetts*

MICHELLE A. HENRY
*Attorney General*

s / *Jennifer A. Thomson*
JENNIFER A. THOMSON
(PA Bar No. 89360)

Pennsylvania Office of Attorney
General
Antitrust Section
14th Floor Strawberry Square
Harrisburg, PA 17120
(717) 787-4530
jthomson@attorneygeneral.gov

*Counsel for Plaintiff-Appellee*
*Commonwealth of Pennsylvania*

JASON S. MIYARES
*Attorney General*

s/  *Tyler T. Henry*
TYLER T. HENRY (VA Bar No. 87621)
*Assistant Attorney General*
*Antitrust Unit*

Office of the Virginia Attorney
General
202 North Ninth Street
Richmond, Virginia 23219
(804) 692-0485
THenry@oag.state.va.us

*Counsel for Plaintiff-Appellee*
*Commonwealth of Virginia*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the word limit of this Court's order dated February 28, 2024, because the brief contains 14,994 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(b) because the brief has been prepared in Microsoft Word for Microsoft 365 using 14-point New Century Schoolbook font, a proportionally spaced typeface.

<u>*s/ Matthew A. Waring*</u>
Matthew A. Waring
*Counsel for the United States*

**CERTIFICATE OF SERVICE**

I certify that on March 5, 2024, I caused the foregoing to be filed

through this Court's CM/ECF system, which will serve a notice of

electronic filing on all registered users, including counsel for Defendant-

Appellant.


s/ *Matthew A. Waring*
Matthew A. Waring
*Counsel for the United States*