**23-1802**

IN THE

# United States Court of Appeals

## FOR THE FIRST CIRCUIT

———◆◆———

UNITED STATES; STATE OF ARIZONA; STATE OF CALIFORNIA; DISTRICT OF
COLUMBIA; STATE OF FLORIDA; COMMONWEALTH OF MASSACHUSETTS;
COMMONWEALTH OF PENNSYLVANIA; COMMONWEALTH OF VIRGINIA,

*Plaintiffs-Appellees,*

—v.—

AMERICAN AIRLINES GROUP INC.,

*Defendant-Appellant,*

JETBLUE AIRWAYS CORPORATION,

*Defendant.*

—————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

## REPLY BRIEF OF DEFENDANT-APPELLANT
## AMERICAN AIRLINES GROUP INC.

---

DANIEL M. WALL
ALFRED C. PFEIFFER, JR.
CHRISTOPHER S. YATES
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, California 94111
(415) 391-0600

GREGORY G. GARRE
FARRELL J. MALONE
PETER E. DAVIS
CHRISTINE C. SMITH
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200

SAMIR DEGER-SEN
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, New York 10020
(212) 906-1200

*Counsel for Defendant-Appellant American Airlines Group Inc.*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. ii

INTRODUCTION ...........................................................................1

ARGUMENT ................................................................................4

I.   PLAINTIFFS DOUBLE DOWN ON THE DISTRICT COURT'S ERRONEOUS VIEW THAT JOINT VENTURES LIKE THE NEA AMOUNT TO A "NAKED ASSAULT ON COMPETITION"....................4

II.  PLAINTIFFS' ATTEMPTS TO REHABILITATE THE DISTRICT COURT'S FLAWED "RULE OF REASON" ANALYSIS FAIL ..............11

     A.   The District Court Erred In Finding Anticompetitive Effects ...........11

          1.   Direct Evidence .........................................................11

          2.   Indirect Evidence ......................................................17

     B.   The District Court Erred In Categorically Dismissing The Procompetitive Benefits Of The NEA ................................22

          1.   The District Court Erred As A Matter Of Law In Refusing To Credit The NEA's Procompetitive Benefits.......................22

          2.   Plaintiffs' Attempts To Recast The District Court's Reasoning Are Unpersuasive ....................................28

     C.   The District Court Erred In Failing To Engage In Any Genuine Step Three Analysis.................................................32

CONCLUSION .............................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Addamax Corp. v. Open Software Foundation, Inc.*,
  152 F.3d 48 (1st Cir. 1998).........................................................................5

*Augusta News Co. v. Hudson News Co.*,
  269 F.3d 41 (1st Cir. 2001).......................................................................13

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*,
  441 U.S. 1 (1979)................................................................................5, 12

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993)..................................................................................21

*Dagher v. Saudi Refining, Inc.*,
  369 F.3d 1108 (9th Cir. 2004), *rev'd sub nom. Texaco Inc. v. Dagher*, 547 U.S. 1 (2006) ........................................................................7

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) ...................................................................30

*Fjord v. AMR Corp. (In re AMR Corp.)*,
  625 B.R. 215 (S.D.N.Y. 2021), *aff'd*, No. 22-901, 2023 WL
  2563897 (2d Cir. Mar. 20, 2023)............................................................26

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) .............................................................24, 31

*Grappone, Inc. v. Subaru of New England, Inc.*,
  858 F.2d 792 (1st Cir. 1988)..............................................................18, 25

*Jefferson Parish Hospital District No. 2 v. Hyde*,
  466 U.S. 2 (1984)......................................................................................21

*MacDermid Printing Solutions LLC v. Cortron Corp.*,
  833 F.3d 172 (2d Cir. 2016) ....................................................................18

*NCAA v. Alston*,
  594 U.S. 69 (2021)...........................................................................*passim*

**Page(s)**

*NCAA v. Board of Regents of the University of Oklahoma*,
468 U.S. 85 (1984)....................................................................7, 30

*Ohio v. American Express Co.*,
585 U.S. 529 (2018)........................................................17, 20, 21, 31

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of Rhode Island*,
373 F.3d 57 (1st Cir. 2004)...................................................25

*Sullivan v. NFL*,
34 F.3d 1091 (1st Cir. 1994)..........................................2, 19, 29, 31

*Texaco Inc. v. Dagher*,
547 U.S. 1 (2006)...............................................2, 5, 7, 8, 12

*Town of Concord v. Boston Edison Co.*,
915 F.2d 17 (1st Cir. 1990)...................................................12

*United States v. American Express Co.*,
838 F.3d 179 (2d Cir. 2016) .................................................25

*United States v. First National Bank & Trust Co. of Lexington*,
376 U.S. 665 (1964)...............................................................1, 5, 6

*United States v. JetBlue Airways Corp.*,
No. 23-10511, 2024 WL 162876 (D. Mass. Jan. 16, 2024) ........................25, 26

*Virgin Atlantic Airways Ltd. v. British Airways PLC*,
257 F.3d 256 (2d Cir. 2001) ..............................................19

## STATUTES

49 U.S.C. § 41308...................................................................27

## OTHER AUTHORITIES

ABA, *Antitrust Law Developments* (8th ed. 2017)....................................6

Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (2023 online ed.)....................5, 6

iii

**Page(s)**

*Competition Enforcement and Regulatory Alternatives-Note by the United States*, OECD (June 7, 2021), https://www.ftc.gov/system/files/attachments/us-submissions-oecd-2010-present-other-international-competition-fora/competition_enforcement_and_regulatory_alternatives_us_submission.pdf ........................................................................27

Fed. Trade Comm'n & Dep't of Justice, *Antitrust Guidelines for Collaboration Among Competitors* (Apr. 2000), .................................2, 5, 23, 24

Final Order, *American Airlines, Inc. et al.*, DOT-OST-2008-0252 (D.O.T. July 20, 2010) ..........................................................................27

Final Order, *Virgin Atlantic Airways et al.*, DOT-OST-2013-0068 (D.O.T. Nov. 21, 2019)........................................................................27

Herbert Hovenkamp, *The Slogans and Goals of Antitrust Law*, 25 N.Y.U. J. Legis. & Pub. Pol'y 705 (2023) ..........................................13

JetBlue Form 10-K (Feb. 22, 2022), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001158463/74797cef-981e-4693-a92b-a50bb6f54848.pdf..............................13

Show Cause Order, *Virgin Atlantic Airways et al.*, DOT-OST-2013-0068 (D.O.T. Aug. 2, 2019)................................................................26

## INTRODUCTION

The district court invalidated the Northeast Alliance (NEA)—a joint venture between American and JetBlue that benefited consumers in Boston and New York through more routes, flights, and seats—based on a fundamental misconception about the meaning of "competition" protected by the antitrust laws, the issue on which the court said "[t]his case turns." ADD10. The NEA was a collaboration that, in the words of one rival (Delta), amounted to a "seismic change" in the competitive landscape in the Northeast, "creating one relevant competitor out of two weak ones." 2-JA1268. Yet the court concluded that the reduction of competition between the joint venturers themselves—"in and of itself," ADD77—was sufficient to prove anticompetitive effects, and to preclude consideration of the procompetitive benefits of the NEA to consumers and the market at large. That fundamental error infected every step of the court's purported rule-of-reason analysis.

In response, Plaintiffs try to recast the district court's decision as a simple application of facts to settled law, but there is nothing simple or factual about the radical vision of the antitrust laws the district court adopted below. This is evident in Plaintiffs' *passim* reliance on precedent predating the modern rule of reason—*United States v. First National Bank & Trust Co. of Lexington* ("*Lexington Bank*"), 376 U.S. 665 (1964)—for the notion that the elimination of substantial competition between joint venturers is enough to prove anticompetitive harm. *Lexington Bank*

1

was decried even at the time it was decided.  Today, it is wholly irreconcilable with modern precedent such as *Texaco Inc. v. Dagher*, 547 U.S. 1 (2006), and the Government's own *Collaboration Guidelines*, Fed. Trade Comm'n & Dep't of Justice, *Antitrust Guidelines for Collaboration Among Competitors* (Apr. 2000), which reject any kind of truncated condemnation of joint ventures.  Instead, existing precedent puts the burden on plaintiffs to prove adverse effects on consumers in terms of "a *reduction in output* [or] an *increase in prices* in the relevant market." *Sullivan v. NFL*, 34 F.3d 1091, 1096-97 (1st Cir. 1994).

Here, it is undisputed that prices did *not* increase under the NEA.  So in their response, Plaintiffs resort to repeatedly claiming that the NEA "reduced output." Pls. Br. 3, 34, 38.  That claim is not only wrong, but highly misleading.  It is based solely on a minor reduction in the frequency of flights on just *two* of the 175 nonstop routes within the NEA.  In fact, the volume of seats *increased* dramatically even on those cherry-picked routes.  But more important, it is undisputed that, under the NEA, there were more flights, more routes, and more seats overall—i.e., output unquestionably *increased*—and Plaintiffs' own expert admitted that he had not made findings of "any consumer harm in any part of the country" under the NEA.  2-JA900-01; *see* 2-JA717, 2-JA895-96.  That is ordinarily dispositive evidence that competition was not harmed, and at the very least shows that the NEA was not the "naked assault on competition" that the district court made it out to be.  ADD92.

2

Meanwhile, Plaintiffs have no meaningful defense of the district court's refusal to credit the procompetitive benefits of the NEA. The NEA enhanced the Airlines' ability to compete against their dominant rivals in the region. Yet the district court refused to credit the procompetitive benefits of the NEA *as a matter of law* because the benefits stemmed from a collaboration it had found to be anticompetitive. Plaintiffs' lead response is simply to deny that the district court did this. Pls. Br. 64. But Plaintiffs' own amici admit the court did, giving away the ruse. Professors Br. 20. And the district court's refusal to consider those benefits is at odds with precedent, the Government's *Collaboration Guidelines*, and the Department of Transportation's longstanding practice of approving airline collaborations after considering such benefits. This blatant legal error gutted step two of the rule of reason and alone requires reversal.

The NEA was a valuable collaboration that benefited consumers. It was entitled to a full and fair review under the rule of reason, not reflexive condemnation based on the district court's fundamentally flawed understanding of the competition protected by the antitrust laws. The district court's decision cannot stand.

**ARGUMENT**

## I.    PLAINTIFFS DOUBLE DOWN ON THE DISTRICT COURT'S ERRONEOUS VIEW THAT JOINT VENTURES LIKE THE NEA AMOUNT TO A "NAKED ASSAULT ON COMPETITION"

Plaintiffs' defense of the district court's decision rests on the same legal mistake that corrupted the district court's analysis of the NEA: that the NEA replaced "competition between American and JetBlue … with cooperation," and "[t]his, in and of itself," was "'by definition, anticompetitive.'"  ADD77 (citation omitted).  In other words, the district court based its decision on the premise that reduction of competition *between* two participants within a joint venture is itself "an actual harm the Sherman Act is designed to prevent," *id.*, that could simultaneously prove adverse effects at step one of the rule of reason and negate as a matter of law any procompetitive benefits at step two.  *See* ADD89-92.

Plaintiffs embrace this central error from the outset of their brief, declaring the NEA so clearly anticompetitive that it could be invalidated under "a quick look, or even per se, analysis," arguing that anticompetitive effects can be assumed solely from the reduction in "head-to-head competition" between JetBlue and American within the scope of the NEA, and asserting that the NEA's procompetitive benefits should be disregarded altogether.  Pls. Br. 16, 62 n.12; *see id.* at 1-2, 34-38, 75-77.  Plaintiffs' insistence that a decision resting on this extreme legal premise "turned on the evidence at trial" is wrong.  Pls. Br. 25.  Indeed, the district court itself *said* that

its decision "turn[ed] on what 'competition' means" under the antitrust laws. ADD10.  That is plainly a legal issue—one Plaintiffs cannot obscure.

The district court's hostility to collaboration infected every page of its decision.  Yet the modern case law addressing joint ventures *accepts* that collaboration can be an important part of a healthy competitive process.  *See, e.g.*, *NCAA v. Alston*, 594 U.S. 69, 87-88 (2021); *Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19-21 (1979); *Addamax Corp. v. Open Software Found., Inc.*, 152 F.3d 48, 52 (1st Cir. 1998).  This perspective is recognized by leading antitrust treatises, *see, e.g.*, Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1504 (2023 online ed.) ("Areeda & Hovenkamp"), and the Government's own *Collaboration Guidelines* (*see supra*, §§ 3.36, 3.6).  This explains why, except where the joint venture is a "complete sham"—plainly not the case here—it is evaluated under the "rule of reason," rather than any kind of truncated analysis presuming adverse effects like *per se* or quick look review.  *Addamax*, 152 F.3d at 52; *see Dagher*, 547 U.S. at 6 n.1.

Against all this, Plaintiffs invoke *Lexington Bank*, a scarcely cited merger decision that was derided even at the time of its adoption more than half a century ago as resting on an already "discarded theory of anti-trust law."  376 U.S. at 673

5

(Harlan, J., dissenting).[1]  Plaintiffs make *Lexington Bank* the centerpiece of their legal argument on appeal because, with the hostility to mergers that was typical of that time period, the Court condemned a merger of two banks based solely on the "elimination of significant competition *between* [the merging firms]."  *Id.* at 674 (emphasis added).  The decision is readily distinguishable:  the *merger* at issue created a *monopoly*—the two banks "held 94.82% of all trust assets" in the relevant market, *id.* at 669—so by eliminating *their* competition, the merger eliminated virtually *all* competition.  Plaintiffs nevertheless claim that *Lexington Bank* set forth a general legal rule that "[e]liminating 'significant competition' between two firms that are 'major competitive factors' in the market is an actual anticompetitive harm," which renders a collaboration unlawful.  Pls. Br. 26 (citation omitted).

This is simply not how collaborations are assessed under modern precedent. That a collaboration will reduce competition *between the joint venture partners* is a given.  For example, in *Dagher*—which Plaintiffs, amazingly, do not even acknowledge in their brief—the Supreme Court addressed a joint venture that "end[ed] competition" between two major companies by consolidating their

---

[1]  The ABA Antitrust Section's two-volume Antitrust Developments treatise does not contain any citation to *Lexington Bank*, and the Areeda & Hovenkamp eight-volume treatise cites it only twice—for a historical comparison of the Sherman Act and Clayton Act standards.  ABA, *Antitrust Law Developments* 457 (8th ed. 2017); Areeda & Hovenkamp ¶¶ 301, 1202a.  In other words, Justice Harlan's prediction in dissent that this decision was "doomed to be a novelty in the reports" was, if anything, too generous.  *Lexington Bank*, 376 U.S. at 673.

operations in the western United States, pooling their revenues, and even setting joint prices. 547 U.S. at 3-5. The Ninth Circuit held that the plaintiffs had raised a triable issue of fact as to whether the joint venture was *per se* unlawful, because it eliminated competition between "two former (and potentially future) competitors." *Dagher v. Saudi Refin., Inc.*, 369 F.3d 1108, 1124 (9th Cir. 2004), *rev'd sub nom. Texaco Inc. v. Dagher*, 547 U.S. 1 (2006). But the Supreme Court unanimously reversed, holding that the joint venture was subject to review under the full rule of reason, rather than any *per se* rule, even as to its "internal pricing decisions." 547 U.S. at 7 & nn.2-3.

Under modern precedent, the reduction of competition between two joint venturers—even significant competitors, as in *Dagher*—does not, in itself, answer the antitrust question. Rather, the rule of reason looks to the impact of the arrangement on competition in the market at large—and specifically how *consumers* were affected—with an understanding "that joint ventures can have … procompetitive benefits" and therefore ought not be condemned "too reflexively." *Alston*, 594 U.S. at 88. In placing a thumb—or, more accurately, an anvil—on the scale against collaboration, the district court inverted these principles.

Plaintiffs insist that the Airlines are seeking a special deferential rule for joint ventures similar to what the NCAA sought in *NCAA v. Board of Regents of the University of Oklahoma*, 468 U.S. 85 (1984), and *Alston*. Pls. Br. 48-49. Not at all.

7

In both cases, the NCAA sought an industry-specific deferential rule—essentially *per se legality*—on the ground that college athletics was special. The Court rejected that special rule and, in *Alston*, reaffirmed that the rule of reason applies to joint ventures. American is simply asking the court to apply the normal rule of reason the way that it traditionally has been applied to joint ventures that, like the one here, are not a "sham." *See Alston*, 594 U.S. at 88; *Dagher*, 547 U.S. at 7-8 & n.3. It is the district court, Plaintiffs, and Plaintiffs' amici that are asking for a special rule—one that deems collaborations among competitors inherently anticompetitive and unlawful. *See* Pls. Br. 2, 26, 32, 62 n.12 (contending that aspects of the NEA are *per se* unlawful); Professors Br. 8 ("[T]he district court probably could have applied a *per se* rule if it wanted …."). Controlling case law does not allow that.[2]

This case underscores why joint ventures must be analyzed under the full rule of reason—with meaningful assessment of the venture's marketwide effects for consumers. Before the NEA, American and JetBlue were unable to offer consumers route options and frequencies akin to what Delta and United—the dominant airlines

---

[2]    In arguing that joint scheduling and revenue sharing alone render the NEA *per se* unlawful, Plaintiffs ignore that the joint venture in *Dagher* had similar features and, unlike the NEA, even coordinated prices. 547 U.S. at 6. Moreover, Plaintiffs did not argue their case under the ancillary restraints doctrine, which is the doctrine used to attack specific features of a joint venture. *See id.* at 7. Joint scheduling is central to all airline joint ventures and is what permits broader, deeper service patterns that benefit customers. AA Br. 11-13. And revenue sharing is a proven mechanism for aligning incentives so that the collaboration thrives—so much so that the DOT requires revenue sharing in international joint ventures.

in the Northeast—provided, particularly in New York.  *See, e.g.*, 2-JA1297-98 (Delta and United holding a 26% and 25% seat share in New York, as compared with 14% and 13% for American and JetBlue).  That long-term gap was driven by resource constraints (like gates and slots) that American and JetBlue faced in the Northeast, which hindered their ability to compete.  As Delta observed, before the NEA, "[American] and [JetBlue] had poor schedule utility and fragmented coverage," JetBlue had "been unable to grow organically due to slot constraints," and American was suffering "unsustainable losses as a standalone carrier" that forced it to "under-utilize[] slots in NYC to curtail losses."  2-JA1271, 1268.

The NEA offered a solution.  The Airlines pooled their resources into a more relevant network that offered, and delivered, more flights, more seats, more routes, shorter connections, better frequent flyer benefits, and more choices—including the choice of more low-fare JetBlue service, since neither JetBlue's business model nor its pricing changed.  *See* 2-JA1367-68; 2-JA1011; 2-JA1293; Dkt. 307 (Tr. 211:21-212:2).[3]  None of this is speculative:  it was *shown by 20 months of data* during the period in which the NEA operated.  Indeed, Plaintiffs' own expert conceded at trial that the NEA had procompetitive benefits.  *See, e.g.*, 2-JA870.  Overall competition in the Northeast increased.  As Delta explained, the NEA amounted to a "seismic

---

[3]    Plaintiffs state (at 6) that the NEA "completely ended competition" between American and JetBlue.  Not so.  Each airline continued to price independently, and JetBlue's low-fare business model did not change.  AA Br. 10.

change[,] … creating one relevant competitor out of two weak ones." 2-JA1268. This "competitive realignment" saw American "transfer under-utilized slots to [the slot-]constrained [JetBlue], realigning partnership capacity to each carrier's strengths and facilitating [JetBlue's] growth beyond 2019 levels." 2-JA1268, 1271.

In this way, American and JetBlue were able to compete more effectively against their rivals by using limited infrastructure more efficiently and by combining complementary flight networks to offer customers more flights to more destinations. ADD42; ADD45; AA Br. 11-13 (collecting record citations). Rivals, in turn, determined that a "commercial response" to the NEA "[wa]s *imperative*." 2-JA1268 (Delta) (emphasis added); *see* 2-JA1265-66 (Alaska Airlines stating NEA would "likely necessitate a response from both Delta and United."). And consumers benefited from this enhanced competition. *See infra* at 14-16, 22-28.

Yet the district court categorically refused to consider those procompetitive benefits because they stemmed from collaboration and the attendant reduction of competition between American and JetBlue. AA Br. 45. In the district court's view, it is anathema to the antitrust laws for significant competitors to collaborate—so much so that the NEA could be deemed a "'naked'" restraint that could be invalidated "'in the twinkling of an eye,'" with "no deep and searching analysis," as if the entirety of the NEA were a price-fixing cartel. ADD75-76 (citations omitted).

The point is not that the district court applied a "quick look" analysis—although it did. The central error was equating the NEA with a naked restraint of trade. That essentially negated Plaintiffs' burden of proof and corrupted the entirety of the district court's analysis. It is alone reason why that decision cannot stand.

## II.    PLAINTIFFS' ATTEMPTS TO REHABILITATE THE DISTRICT COURT'S FLAWED "RULE OF REASON" ANALYSIS FAIL

Plaintiffs' efforts to mask this central legal error by pretending the district court engaged in a routine application of the rule of reason fail.

### A.    The District Court Erred In Finding Anticompetitive Effects

#### 1.    Direct Evidence

a. Head-to-Head Competition: Plaintiffs' experts conceded at trial that they had adduced no evidence of actual consumer harm from the NEA in the 20 months from its inception to trial. AA Br. 36-37; *see* 2-JA699. The district court nevertheless found actual harm from the fact of collaboration itself, joint network planning, and "weaken[ing]" of JetBlue's "maverick" status. ADD76-84. All of those are variations on the district court's core view that the NEA reduced *American-JetBlue competition* and for that reason alone was anticompetitive. ADD77; *see* Pls. Br. 33-37 (addressing all three reasons together under the heading of the "loss of significant head-to-head competition" between American and JetBlue).

It is this argument that brings *Lexington Bank* back from the grave—because there is *nothing* more recent to cite. Outside of the rare "sham" joint venture (lacking

any procompetitive rationale), no modern appellate court has *ever* held that the intra-joint venture reduction of competition alone satisfies a plaintiff's burden to prove anticompetitive effects. The rule of reason focuses on the effects on competition and consumers in the market *as a whole*, not just on competition between collaborators, and treats that as an empirical question—focused on output, prices, and quality—not inferred from the fact of collaboration inherent in all joint ventures. *See, e.g.*, *Alston*, 594 U.S. at 97; *Dagher*, 547 U.S. at 5-8. *Dagher* and *Broadcast Music,* among other cases, would be wrongly decided if Plaintiffs' *Lexington Bank* argument were right. Those cases held that joint ventures that ended competition between significant competitors (*Dagher*) and involved joint price setting (*Dagher* and *Broadcast Music*) were *not* unlawful for that reason alone, but subject to the full rule of reason because of their capacity to generate procompetitive benefits. *Dagher*, 547 U.S. at 4, 7 & n.3; *Broadcast Music*, 441 U.S. at 4-6; *see supra* at 5-7.

Recasting this argument as harm to "the competitive process" changes nothing. Pls. Br. 34-35 (citation omitted). Under modern case law, Plaintiffs cannot merely incant that a collaboration "harm[ed] the competitive process" and move on; instead, they must *show* that it did—i.e., by showing "obstruct[ion] [of] the achievement of competition's basic goals—lower prices, better products, and more efficient production methods." *Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 21-22 (1st Cir. 1990) (Breyer, J.). This "sounds like a difficult task and it usually

is." *Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 49 (1st Cir. 2001). Absent a concrete analysis of the impact on the market, Plaintiffs' "competitive-process" argument is merely a "slogan"—a slogan that is not "a useful device for making real [antitrust] decisions." Herbert Hovenkamp, *The Slogans and Goals of Antitrust Law*, 25 N.Y.U. J. Legis. & Pub. Pol'y 705, 751 (2023).

When it comes to slogans, Plaintiffs also invoke JetBlue's so-called "maverick" effect, arguing that the NEA "weaken[ed] JetBlue as a maverick competitor." Pls. Br. 43; *see id.* at 52. But Plaintiffs' experts conceded that issue too. The main benefit of JetBlue's so-called "maverick" effect is lower fares. Pls. Br. 8; ADD22 & n.13. But when asked whether he had seen "any empirical evidence or even any anecdotal evidence that JetBlue has changed its low cost carrier business model as a result of the NEA" or that there was any visible "loss of a JetBlue effect," *Plaintiffs' expert said no.* Dkt. 307 (Tr. 211:21-212:2); *see* 2-JA699 (conceding no observed price increases under NEA); 2-JA717.[4]

---

[4]    Plaintiffs point to a minor increase in JetBlue's operating costs and its failure to obtain certain takeoff rights at Heathrow and Newark. Pls. Br. 52. But the operating costs Plaintiffs identify total approximately one-tenth of one-percent of JetBlue's annual revenues. ADD46 n.49; JetBlue Form 10-K at 37 (Feb. 22, 2022), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001158463/74797cef-981e-4693-a92b-a50bb6f54848.pdf. Meanwhile, JetBlue ultimately obtained slots at Heathrow, AA Br. 38; ADD47, and the Newark takeoff rights went to another even lower-cost carrier, Spirit, which serves a similar role of reducing prices, ADD47-48, 80.

Plaintiffs' focus on the Airlines' supposed "inten[t]" is similarly flawed.  Pls. Br. 37-38 (citation omitted).  Contrary to Plaintiffs' claim, the district court did not find that the NEA was intended to "end … competition" between JetBlue and American.  Pls. Br. 37.  Rather, the court found that the "primary goal" of the NEA was "to address the competitive threat" from Delta and United.  ADD28 n.21; *see* ADD31 ("purpose" is "to strengthen the competitive position of American and JetBlue with respect to 'Delta and United'"); ADD89-90.  Regardless, the relevant question is not simply whether venture partners "intend" to reduce competition *between themselves*, but the effect of that collaboration on overall market competition.  Plaintiffs avoid that issue entirely—understandably, since their experts conceded there was no evidence of any "observed post[-]NEA price increases or other changes adverse to customers."  2-JA699.

b.  <u>Plaintiffs' Alternative Justifications</u>:  Plaintiffs also briefly attempt (at 38-39) to rehabilitate the district court's direct-effects ruling based on alternative justifications the court never adopted.  That effort fails too.

i.  *Output*.  First, Plaintiffs misleadingly claim that the district court found that the NEA reduced output.  But the district court *agreed* with the Airlines that net output *increased* under the NEA as to flights, seats, and routes.  ADD42.  It never made any finding that total output decreased in any relevant market, because, at trial, Plaintiffs did not seriously contest the point.  1-JA601 (Plaintiffs' expert conceding

that "total capacity growth of JetBlue and American ha[d] exceeded the[ir] competitors" at NEA airports); 2-JA717 (no analysis of "actual NEA schedules" finding "reductions of output"); 2-JA895-96 (no analysis finding "actual adverse effects"); 2-JA900-01 (no analysis finding "any consumer harm in any part of the country" from changes in service under the NEA).

Plaintiffs now argue that minor reductions in *frequencies* (i.e., flights per day) on *two isolated routes*—BOS-LGA and BOS-DCA—prove reduced output. Pls. Br. 38; ADD44-45 & n.45. That argument is specious. It relies on just *two* out of *over 175 nonstop routes* within the NEA, an implicit concession that output was *not* lower generally. 2-JA1011.[5] And even as to those routes, the Airlines' total capacity (i.e., seats per day) *increased* dramatically under the NEA. When American exited the BOS-LGA route, JetBlue began offering over *three times* the seat capacity American had offered—and Delta expanded at the same time. *See* DX751 (calculated using DOT T-100 database in record for flights January 2021-September 2022). As to BOS-DCA, American and JetBlue continued to serve the route, and JetBlue *tripled* its capacity—to which Delta responded by re-entering the route. *Id.*; *see also* Dkt.

---

[5]    On the BOS-LGA route, there was a reduction of just *one* flight per day by American and JetBlue together, from 16 to 15 daily flights. ADD44. On the BOS-DCA route, the reduction was from 29 to 24 daily flights (where American and JetBlue had offered the same flight at the same time). Plaintiffs also briefly claim reductions on the JFK-San Francisco (SFO) route, Pls. Br. 13, but the district court did not mention that route.

311 (Tr. 165:9-11, 167:3-19) ("seats [we]re up" on BOS-DCA route).  In other words, there was a significant *increase*—not *decrease*—in output on these routes.

But that is just one tiny slice of the equation.  In the NEA region as a whole, consumers had the ability to enjoy nearly *50* new nonstop routes and increased frequencies on more than *100* existing routes, amounting to a *200%* capacity increase overall.  *See* 2-JA1367-38; 2-JA1011; 2-JA1293.  Under any reasonably complete assessment, output unquestionably *increased* under the NEA.

ii.    *Consumer choice.*    Plaintiffs also argue that the Airlines "reduced consumer choice" by purportedly allocating markets.  Pls. Br. 39 (capitalization normalized).  This is a variation on the argument that there was less American-JetBlue competition, and it fails for the same reasons.  Moreover, Plaintiffs focus on minutiae like the choices available at a "specific time[]" of day.  *Id.*  But even the district court recognized that reducing the overlap between American's and JetBlue's takeoff times had a "flip side" benefit: more flights "at *more times* throughout the day."  ADD44 n.45 (emphasis added).  And the bigger picture is that through output expansion—more flights, more routes, more seats, better frequent flyer benefits, etc.—the NEA created more choices for consumers.  Bostonians and

16

New Yorkers who wanted to "visit loved ones, do business, and vacation on a budget," Pls. Br. 1, had *more* to choose from than before the NEA.[6]

### 2. Indirect Evidence

Plaintiffs fare no better in trying to defend the decision below under the indirect approach, which requires "proof of market power *plus* some evidence that the challenged restraint harms competition." *Ohio v. American Express Co.* ("*Amex*"), 585 U.S. 529, 542 (2018) (emphasis added). Plaintiffs show neither.

a. <u>Harm</u>: The district court's "indirect" analysis of harm begins by quoting and incorporating its direct-effects holding. ADD87. That plainly makes the court's indirect-effects holding contingent on its direct-effects analysis. Plaintiffs insist that this reasoning is "circular," Pls. Br. 45, because even if the evidence does not infer *actual* harm, it might infer *future* harm. But the district court did not embrace the predictive case that Plaintiffs put on at trial. It said that, "[i]n assessing effects, the Court is concerned primarily with actual, short-term impacts the NEA *has had*," ADD94 n.98 (emphasis added), and it did not attempt to find likely harm through Dr. Miller's merger simulation, or another route. Any circularity problem therefore lies with the district court's approach and is a basis for reversal.

---

[6]     The premise of Plaintiffs' argument—that the Airlines exited routes in service of a goal of "one carrier per market"—is false. Pls. Br. 13 (quoting ADD82). As Plaintiffs know, there were only a handful of routes on which one Airline exited, and the Airlines' commitments to DOT generally precluded JetBlue from exiting *any* non-seasonal, non-stop New York route. 1-JA386.

Plaintiffs suggest that the court *did* agree with Dr. Miller that "consumers were 'likely to pay higher prices for flights' as a result of the NEA," but they quote Dr. Miller, not the district court.  Pls. Br. 46 (emphasis omitted) (quoting Dkt. 307 (Tr. 92:15-15-93:2)).  The district court pointedly declined to embrace Dr. Miller's (wholly implausible) price increase estimate, or any approximation of it.  ADD56.  It relied only on Dr. Miller's theory of "upward pricing pressure," without finding any tangible consumer harm in the 20 months the NEA operated.[7]  Indeed, the district court brushed price effects aside on the ground that "antitrust liability [does not] require proof of price increases."  ADD87 n.89.

To prove harm at step one, it is not enough to show that the challenged conduct *could* result in "'*potential[ly]*'" "higher prices."  *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182-84 (2d Cir. 2016); *see Grappone, Inc. v. Subaru of N.E., Inc.*, 858 F.2d 792, 799 (1st Cir. 1988) ("*potential* effect" not enough).  In a Section 1 case, actual harm must be proven either directly or by a reasonable inference that it likely exists.  *MacDermid*, 833 F.3d at 182-84.  Here, Plaintiffs tried—and failed—to quantify price and output effects through Dr. Miller's merger

---

[7]    In the mathematics of a merger simulation, any reduction in the number of competitors in the model creates upward pricing pressure and higher prices in the absence of offsetting efficiencies.  2-JA710-11; 2-JA749.  The district court's willingness to "credit[] Dr. Miller's analysis to the extent it suggests the NEA will create upward pricing pressure," ADD56, is simply an acknowledgement of an inevitable result of the model's construction and nothing like a finding that higher prices are likely.

simulation; Plaintiffs' experts conceded that there were no signs of higher prices or loss of the JetBlue effect in nearly two years of real-world data; and Plaintiffs' experts did not dispute that output increased during this period. That record cannot sustain a finding of harm—actual or likely. *See Sullivan v. NFL*, 34 F.3d 1091, 1096-97 (1st Cir. 1994) (anticompetitive effects "usually measured by a *reduction in output* and an *increase in prices* in the relevant market" (citation omitted)); *Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001).

b. <u>Market Power</u>:  On the market-power requirement, Plaintiffs have very little response, apart from misconstruing American's arguments.

The primary failing in the district court's market-power analysis is that it ignored the central question of whether—irrespective of market shares or whether they were calculated properly—the Airlines could have profitably raised marketwide prices by restricting their own output in any of the relevant markets. AA Br. 41.  The Airlines competed with Delta or United—or both—on substantially every NEA route, as well as other airlines.  The potential for any output reduction by the Airlines to be immediately countered by a rival's expansion was clear.

The district court did not conduct any meaningful analysis of this issue.  That is evident from the fact that, in response, Plaintiffs cite a *separate part* of the district court's opinion stating that entry is generally difficult at JFK, LGA, and Logan.  Pls. Br. 41-42 (citing ADD78-79).  But in that section, the court was *not* addressing the

ability of Delta and United (or other airlines) to respond if the NEA restricted output in any relevant market using slots, gates, or other assets competitors *already had*. Indeed, after Delta concluded that a "coordinated commercial response [to the NEA] is imperative," 2-JA1268, it used its existing assets to re-enter the BOS-DCA route and expand its service on the BOS-LGA route. Nor was the court finding that American and JetBlue had enough market share "to raise price profitably by restricting output." *Amex*, 585 U.S. at 549 (emphasis and citation omitted). The district court never addressed that central issue, much less made such a finding.

Plaintiffs try to overcome this failure by trumpeting market-share figures for a few cherry-picked routes. Pls. Br. 1, 7, 17, 35-36, 41, 44. Plaintiffs' chart (at 7) is particularly specious. The 96% market share, for example, is for a single route (Charlotte to Boston) that was carved out of revenue sharing under the NEA. Pls. Br. 7 (citing 2-JA1295); ADD36-37 (listing carveout routes). The majority of the other high market-share figures Plaintiffs cite come from other carveout routes or minor seasonal routes like NYC to Nantucket or Martha's Vineyard. Pls. Br. 7 (citing 2-JA1295); ADD36-37. Moreover, the chart features only 29 routes—out of more than one hundred within the NEA—thus effectively conceding that the Airlines did not have sufficient market share on most NEA routes.

But Plaintiffs have a bigger problem. The district court made *no* route-specific findings,[8] and it refused to resolve the contested market definition issues, including as to Newark. AA Br. 42. Rather, it concluded only that the Airlines' combined market share "in the northeast generally" was "at least a quarter." ADD87; *see also* ADD85-86 (Airlines' combined market share for New York was 25% with Newark included). Such a share, ironically, ordinarily infers *the absence of market power*. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 7-8, 26-29 (1984) (30 percent market share insufficient to show market power).

Certainly, Defendants' purported ability to "influence" prices," Pls. Br. 42 (emphasis and citation omitted), does not save the day. This is *not* "a common way to define market power." *Id*. at 42-43. Market power is the ability to "raise … prices above a competitive level." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 235 (1993). Plaintiffs' evidence shows nothing more than the ability of low-cost carriers to drive prices down when they enter a route, which is different than the power to raise prices profitably *above the competitive level* by restricting output over a non-transitory period of time. AA Br. 42-43; *Amex*, 585 U.S. at 548. If Plaintiffs' view of market power were correct, it would mean that

---

[8]    Plaintiffs' claim (at 41 n.6) that this issue is "not properly before this Court" is wrong. American argued in its brief that the district court improperly "found market power on the basis of the Airlines' *combined* regional market shares," not its route-specific shares. AA Br. 42 (emphasis added); *see id.* at 43.

low-cost carriers individually have market power.  That is obviously wrong.  There was no proof that American or JetBlue, or the two as the NEA, ever had market power allowing them to raise prices profitably above a competitive level.

## B.    The District Court Erred In Categorically Dismissing The Procompetitive Benefits Of The NEA

At step two, the district court categorically refused to consider any procompetitive benefits of the NEA based on its finding that the collaboration itself was anticompetitive.  ADD89-91.  While Plaintiffs' amici (Professors Br. 20) acknowledge this stunning reasoning, Plaintiffs simply deny it, and instead float a series of alternative justifications to save the court's decision.  That effort fails.

### 1.    The District Court Erred As A Matter Of Law In Refusing To Credit The NEA's Procompetitive Benefits

To start, while they now contend that the Airlines failed to prove any procompetitive benefits, Plaintiffs did not make this argument below (where their experts conceded such benefits), and they make the argument now only by taking liberties with the record.  The district court itself recognized many such benefits:

- "[S]ince the NEA was announced, American's slots at JFK and [LGA] have been used more heavily and efficiently" by JetBlue, creating more flights and more seats on those flights.  ADD42.

- American increased its output by "'upgaug[ing]' its regional jets (replacing smaller jets offering fewer seats with larger ones offering more)," adding "long-haul routes with larger aircraft," and "increas[ing] … service in New York," including by adding "flights to leisure destinations instead of 'cut[ting]

the schedule down harder on Saturdays,' as it previously did."  ADD42-43 (citation omitted).

- "[D]efendants' incentive to grow in New York and make full use of their valuable resources at [LGA] and JFK [was] intensified by" promises made in connection with the NEA.  ADD43.

- The NEA was likely to "support" the Airlines' continued "efforts to add to their fleets by purchasing new planes in the future—a proposition that ma[de] intuitive sense."  ADD41.

- As a result of the NEA, "frequent flyers and many corporate clients of both defendants ha[d] gained broader access to benefits and discounts than they had previously."  ADD45.

Yet the district court dismissed *all* these procompetitive benefits because they stemmed from a collaboration the district court not only deemed anticompetitive, but a "naked assault on competition."  ADD76 n.78, 89-92, 95; *see* ADD13 (deeming "benefits" of allowing the Airlines to better compete "in the northeast generally or in their shared rivalry with Delta" irrelevant because "such benefits arise from a naked agreement not to compete with one another").  Of course a judge who adopts that perspective—the essence of "quick look" or *per se* condemnation—will deny consumer benefits.  But categorically dismissing such benefits is clearly wrong.

"[T]he term 'procompetitive benefit' refers to an agreement's favorable competitive consequences, *without taking account of its anticompetitive harm*." *Collaboration Guidelines* § 1.1 (emphasis added).  As American explained in its

opening brief, the second step of the rule of reason assesses whether a collaboration already deemed to have anticompetitive effects at step one has any offsetting procompetitive benefits at step two, setting up the final analysis at step three. AA Br. 44-49. By rejecting the NEA's benefits outright, the court never conducted the proper three-step inquiry and reduced the analysis to just one step.

The district court tried to make this a "motive" issue, claiming that the Airlines had an *improper* "motiv[e]"—namely, "strengthen[ing] their own competitive positions against Delta (and, to a lesser extent, United)." ADD89. The district court acknowledged that this motive was "'procompetitive' in the business sense of the word," yet reasoned that it was anticompetitive in the legal sense. ADD89-90. That was error. The *primary* procompetitive rationale for this collaboration, like many others, is creating a stronger competitive force. As the Government's own *Collaboration Guidelines* recognize, "collaboration generated efficiencies may enhance competition by permitting two or more ineffective … participants to become more effective … competitors." *Collaboration Guidelines* § 3.36.

Private benefits to collaborators—e.g., more sales born of a superior product—may provide an incentive to collaborate, but that is no basis to disregard the procompetitive benefits of the collaboration to consumers. *See, e.g.*, *FTC v. Qualcomm Inc.*, 969 F.3d 974, 994 n.15 (9th Cir. 2020) (rejecting district court's conflation of "the desire to maximize profits with an intent to 'destroy competition'"

24

(citation omitted)).  Moreover, the antitrust laws do not shield dominant firms (here, United and Delta) from competition, or lock their rivals into smaller market shares. *See* ADD90 n.94 (arguing that "Delta is entitled to the fruits of the success it has achieved by operating independently"); *United States v. American Express Co.*, 838 F.3d 179, 204 & n.50 (2d Cir. 2016) (noting the irony in a government antitrust case that would protect rivals' market shares); *Grappone*, 858 F.2d at 794.

The district court's refusal to credit the obvious procompetitive benefits of the NEA for consumers—including its expanded output, complementary resources, broadened network, shorter connection times, and improved frequent flyer benefits—contravenes this Circuit's case law.  *See Grappone*, 858 F.2d at 794 ("[A]ntitrust laws protect the competitive process *in order to help individual consumers* by bringing them the benefits of low, economically efficient prices, efficient production methods, and innovation." (emphasis added)); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 63 (1st Cir. 2004) (citing "expanded … network" as example of procompetitive "efficiency").  Indeed, in the JetBlue/Spirit merger case, the district court recognized that, while the merger eliminated competition between JetBlue and Spirit, it still would generate procompetitive benefits.  For example, the combined firm would have been "a stronger competitive counterpart" to larger airlines than either JetBlue or Spirit "on its own." *United States v. JetBlue Airways Corp.*, No. 23-10511, 2024 WL 162876,

at *34-36 (D. Mass. Jan. 16, 2024).  The court also understood that "the number of routes" and "options it offers … add to an airline's relevance to consumers," placing "more pressure" on its rivals to compete on prices, output, and quality, thereby benefiting consumers.  *Id.* at *35.[9]  This is not new.  Airline merger cases have always acknowledged—and accepted—the consumer benefits from networks that offer more flights, destinations, and options.  *See, e.g.*, *Fjord v. AMR Corp. (In re AMR Corp.)*, 625 B.R. 215, 234-35 (S.D.N.Y. 2021) (finding American and US Airways merger procompetitive due to "more comprehensive [combined] network" enabling competition with "other legacy carriers"), *aff'd*, No. 22-901, 2023 WL 2563897 (2d Cir. Mar. 20, 2023).

In approving international joint ventures, the DOT has likewise recognized such pro-consumer benefits.  As the DOT has explained, "joint ventures can foster … cost and operational efficiencies, broader network coverage (resulting in more paths between a given origin and destination), … increased capacity (beyond a market's expected growth rate), and alignment of frequent flyer benefits."  Show

---

[9]    The JetBlue/Spirit court enjoined the merger.  But where that court found the merger would *reduce* output by about 6 million seats each year, *JetBlue*, 2024 WL 162876, at *15, the district court here agreed that output increased under the NEA, *see supra* at 14-15, 22-23.  And where the JetBlue/Spirit court found the merger would totally eliminate Spirit's ultra-low-cost business model, 2024 WL 162876, at *27-29, the district court here determined price effects were unnecessary and Plaintiffs conceded JetBlue's pricing behavior had not changed, *see supra* at 13, 17-19.

Cause Order 10, *Virgin Atlantic Airways et al.*, DOT-OST-2013-0068 (D.O.T. Aug. 2, 2019); *see* Final Order 1, *id.* (Nov. 21, 2019) (approving that venture).  Unlike the district court here, the DOT has recognized that "the analysis does not end" with the acknowledgement that the venture "will result in a reduction in the number of competitors in nonstop overlap markets."  Final Order 9, *American Airlines, Inc. et al.*, DOT-OST-2008-0252 (D.O.T. July 20, 2010); *see id.* at 3 (benefits include "new routes," "[a]dditional flights on existing routes," "[i]mproved schedules," and "[r]educed travel and connection times").  Instead, the analysis of any such collaboration requires a consideration of the offsetting benefits.  *Id.* at 11-13.  One of the most anomalous aspects of the district court's decision is that it held that a collaboration that an expert federal agency—the DOT—accepted, conditioned on growth commitments, had no cognizable procompetitive benefits at all.[10]

Instead of accounting for the district court's error, Plaintiffs attack a strawman by contending that the Airlines are advancing a "'bigger-is-necessarily-better' rationale."  Pls. Br. 64.  The Airlines have never based their defense of the NEA on

---

[10]  Plaintiffs point to the immunity provision for international alliances and argue that immunity is required because "their output coordination and revenue sharing otherwise would violate antitrust law."  Pls. Br. 11.  Not true.  Antitrust immunity is *available*, not *required*, and as the Government itself has stated, this is simply to protect airlines from being exposed to the "risk" of antitrust liability.  *Competition Enforcement and Regulatory Alternatives—Note by the United States* ¶ 17, OECD (June 7, 2021), https://www.ftc.gov/system/files/attachments/us-submissions-oecd-2010-present-other-international-competition-fora/competition_enforcement_and_regulatory_alternatives_us_submission.pdf; *see* 49 U.S.C. § 41308.

the notion that "bigger" is generally, let alone necessarily, "better," but rather on the network efficiencies the NEA unlocked—efficiencies that logically flow from the combination of complementary resources that the DOT saw, that rival airlines clearly recognized,[11] and that Plaintiffs acknowledged factually even as they strived to discredit them. *See, e.g.*, 2-JA870 ("Q. So you're not saying the benefits are zero or anywhere close to zero, right?  A. *Oh, no, not at all.*" (emphasis added)).  The district court erred in categorically disregarding those benefits—draining step two of any meaning in its flawed rule of reason analysis.

### 2.     Plaintiffs' Attempts To Recast The District Court's Reasoning Are Unpersuasive

Plaintiffs attempt to distract from a clear legal error by arguing that the district court's decision was instead based on credibility determinations, a lack of causation, and out-of-market effects.  None of these alternative justifications suffices.

First, the district court's holding was by no means rooted in its flawed credibility determinations.  Pls. Br. 65-66.  Setting aside whether opining that an expert "misunderstands the standards governing federal antitrust analysis," ADD57, is a true credibility determination (and it is not, *see* AA Br. 43 n.12), the district court did not base its refusal to credit the NEA's procompetitive benefits at step two on

---

[11]  *See, e.g.*, 1-JA196 (Southwest executive recognizing that NEA's expanded network made it "more attractive" to consumers); 2-JA1268 (Delta) (similar).

any credibility determinations. Indeed, the court did not mention its credibility findings *at all* in its analysis of step two. ADD88-99.

Second, the Airlines did not have the burden at step two to negate every possible alternate explanation for the consumer benefits realized when the NEA was in effect. Pls. Br. 62-63, 66-67. This is the foundation of Plaintiffs' argument that the massive increases in output under the NEA might not have been due to the NEA. But this misperceives a defendant's step two burden. As *Alston* explains, the defendant's burden is "to show a procompetitive *rationale* for the restraint," at which point "the burden shifts back *to the plaintiff* to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means.'" 594 U.S. at 96-97 (emphasis added) (citations omitted); *contra* Pls. Br. 51 (incorrectly quoting *Alston* for proposition that *defendants* must "*prove* that the venture has procompetitive benefits that cannot 'be reasonably achieved through less anticompetitive means'" (emphasis added) (citation omitted)).

Moreover, while courts should, of course, "exclud[e] justifications that are *so* unrelated to the challenged practice that they amount to a collateral attempt to salvage [it]," courts must "give a measure of latitude to antitrust defendants in their efforts to explain the procompetitive justifications for their policies and practices." *Sullivan*, 34 F.3d at 1112 (emphasis added). To the extent such causation arguments are relevant, then, it is at step three when "fashion[ing] less restrictive alternatives."

29

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 986 (9th Cir. 2023).  It is not a reason to hold that the Airlines "lacked *any* procompetitive rationale" at step two.  *Id.* Neither *Alston* or *Board of Regents* is to the contrary.  *Alston* states explicitly that "the [district] court's judgment ultimately turned on the key question at the third step."  594 U.S. at 99-100.  And *Board of Regents* found that the challenged arrangement was not necessary to produce the asserted efficiencies.  468 U.S. at 114.

Plaintiffs try to dismiss the Airlines' growth based on an industry-wide, post pandemic rebound.  Pls. Br. 67-68.  But Plaintiffs cite no district court finding to that effect—because there is none.  And this argument is belied by the fact that the Airlines' growth came at a far faster rate than their competitors:



DX1091 at 135; *id.* at 139-40 (American and JetBlue's capacity rose 18% at NEA airports while all other carriers' capacity declined by 22% from Q2-2019 to Q2-2022); 1-JA601 (Plaintiffs' expert conceding that "total capacity growth of JetBlue

and American ha[d] exceeded the[ir] competitors" at the NEA airports).[12]  This is not just "correlation."  Pls. Br. 67.  The fact that consumers chose the NEA over other alternatives is compelling proof that it benefited consumers.

Finally, Plaintiffs' reliance (at 69-70) on unproven, out-of-market effects to reject the NEA's benefits is wrong logically and legally.  This argument uncritically assumes that anything an airline does to expand output and benefit one group of consumers reduces output somewhere else and harms other consumers.  But in reality, airlines redeploy assets all the time from one route to another—whether due to excess capacity on an existing route, inefficiency, seasonality, or other changes in consumer preference.  And new planes require no redeployment at all.

In any event, in undertaking an antitrust analysis, "courts must focus on anticompetitive effects '*in the market where competition is [allegedly] being restrained*.'"  *Qualcomm Inc.*, 969 F.3d at 992 (emphasis added) (citation omitted).  Plaintiffs' argument disregards that the key inquiry is the "impact on competition *in the relevant market itself*."  *Sullivan*, 34 F.3d at 1113 (emphasis added); *see Amex*, 585 U.S. at 541 (similar).  Most importantly, Plaintiffs did not even try to prove at trial, with facts, that the explosion of output in the NEA territories harmed anyone.

---

[12]  The graph Plaintiffs offer (at 68) is highly misleading because it considers only *domestic* routes, without accounting for the new "long-haul," *international* routes that American was able to add as a result of the NEA.  ADD42.

As a matter of law, speculation about *potential* out-of-market adverse effects cannot negate *proven* in-market benefits.  The undisputed evidence of NEA benefits *in the relevant markets* met the Airlines step two burden.  At a minimum, the district court erred as a matter of law in excluding consideration of those benefits at all.

## C.    The District Court Erred In Failing To Engage In Any Genuine Step Three Analysis

Finally, the district court improperly failed to engage in any genuine step three inquiry.  Plaintiffs try to paper over this error, arguing that "[e]ven if Defendants had carried their step-two burden, affirmance would be warranted based on … the district court's [step-three] determinations."  Pls. Br. 30.  But the district court's step-three holding that the West Coast International Alliance (WCIA) constituted a less restrictive alternative *depended* on its erroneous step-one determination that Plaintiffs "made a decisive showing of anticompetitive harm" and its refusal to credit the procompetitive benefits of the NEA at step two because (in the district court's view) they stemmed from anticompetitive conduct.  ADD99; *see also* ADD101 ("A 'reasonable' alternative need not produce benefits … rejected at step two ….").  Had the NEA's benefits been acknowledged, the question would have been whether an arrangement similar to the WCIA would have been commercially viable and would have "achieve[d] the same procompetitive effect as the [NEA]."  *Alston*, 594 U.S. at

100 (citation omitted).  Plaintiffs never offered such an analysis,[13] and the district court—which, as discussed, categorically excluded consideration of the NEA's procompetitive benefits—never undertook it.  Thus, this Court cannot affirm the decision based on the district court's flawed conclusions at step three.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court and vacate the permanent injunction.

April 16, 2024                                                  Respectfully submitted,

                                                               */s/ Gregory G. Garre*

Daniel M. Wall                                Gregory G. Garre
Alfred C. Pfeiffer, Jr.                       Farrell J. Malone
Christopher S. Yates                          Peter E. Davis
LATHAM & WATKINS LLP                          Christine C. Smith
505 Montgomery Street, Suite 2000             LATHAM & WATKINS LLP
San Francisco, CA 94111-6538                  555 Eleventh Street, NW, Suite 1000
(415) 391-0600                                Washington, DC 20004
                                              (202) 637-2207

                                              Samir Deger-Sen
                                              LATHAM & WATKINS LLP
                                              1271 Avenue of the Americas
                                              New York, NY 10020
                                              (212) 906-1200

*Counsel for Defendant-Appellant American Airlines Group Inc.*

---

[13]    *See, e.g.*, Dkt. 315 (Tr. 30:7-20) (Plaintiffs' expert admitting that he had "not assessed whether a WCIA-like arrangement would have made financial sense" and had "not quantified" whether it would have "achieved substantially the same benefits as the [NEA]").

## CERTIFICATE OF COMPLIANCE

I hereby certify that, in accordance with this Court's order of March 29, 2024, the foregoing brief contains 7,988 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

I hereby certify that this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

*/s/ Gregory G. Garre*
Gregory G. Garre

## CERTIFICATE OF SERVICE

I hereby certify that I have this 16th day of April, 2024, electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system.  Participants that are registered CM/ECF users will be served by the CM/ECF system.  On April 16, 2024, I caused Adam Gitlin and Patricia Corcoran, who are not registered with CM/ECF, to be served by electronic transfer at adam.gitlin@dc.gov and patricia.corcoran@usdoj.gov, pursuant to their consent to such service.

*/s/ Gregory G. Garre*
Gregory G. Garre