# United States Court of Appeals
## For the First Circuit

---

No. 23-1802

UNITED STATES; STATE OF ARIZONA; STATE OF CALIFORNIA; DISTRICT
OF COLUMBIA; STATE OF FLORIDA; COMMONWEALTH OF MASSACHUSETTS;
COMMONWEALTH OF PENNSYLVANIA; COMMONWEALTH OF VIRGINIA,

Plaintiffs, Appellees,

v.

AMERICAN AIRLINES GROUP INC.,

Defendant, Appellant,

JETBLUE AIRWAYS CORPORATION,

Defendant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

---

Before

Barron, Chief Judge,
Kayatta and Gelpí, Circuit Judges.

---

Gregory G. Garre, with whom Alfred C. Pfeiffer, Jr., Samir
Deger-Sen, Christopher S. Yates, Farrell J. Malone, Peter E. Davis,
Christine C. Smith, Marissa Marandola, and Latham & Watkins LLP
were on brief, for appellant.

Mark C. Fleming, Leon B. Greenfield, Natalie M. Morrissey,
Wilmer Cutler Pickering Hale and Dorr LLP, Tyler S. Badgley, Kevin
R. Palmer, and U.S. Chamber of Commerce Litigation Center on brief

for Chamber of Commerce of the United States of America, amicus curiae.

Peter J. Carney, Dana Foster, Cansu Gunel, Andrew Hamm, Bryan D. Gant, and White & Case LLP on brief for The International Center for Law & Economics and Antitrust Scholars, amici curiae.

Daniel E. Haar, with whom Jonathan S. Kanter, Assistant Attorney General, U.S. Department of Justice, Antitrust Division, Doha G. Mekki, Principal Deputy Assistant Attorney General, Hetal J. Doshi, Deputy Assistant Attorney General, Michael B. Kades, Deputy Assistant Attorney General, David B. Lawrence, Policy Director, Markus A. Brazill, Counsel to the Assistant Attorney General, William H. Jones II, Counsel to the Director of Civil Litigation, Patricia C. Corcoran, James H. Congdon, Scott L. Reiter, John J. Sullivan, Nickolai G. Levin, Matthew A. Waring, and Alice A. Wang were on brief, for appellees.

Robert K. Shelquist, Lockridge Grindal Nauen PLLP, and Christopher L. Sagers, on brief for Professors of Law, Business, and Economics, amici curiae.

---

November 8, 2024

---

KAYATTA, Circuit Judge.  In 2020, American Airlines and JetBlue entered into a joint venture called the Northeast Alliance ("NEA"), under which the carriers effectively agreed to operate as a single airline with respect to most of their routes in and out of Boston and New York City.  The U.S. Department of Justice ("DOJ"), joined by several states, filed suit to enjoin the carriers from proceeding with the NEA, alleging that it ran afoul of the Sherman Act as an unreasonable restraint on competition. After an extensive bench trial, the district court agreed and entered judgment for plaintiffs.  American Airlines now appeals. Seeing no reversible error of either fact or law, we affirm.  Our reasoning follows.

### I.

### A.

In the passenger airline industry, where "market share and capacity" have become "concentrated among a relatively small number of domestic carriers," United States v. Am. Airlines Grp. Inc., 675 F. Supp. 3d 65, 76 (D. Mass. 2023), American and JetBlue are no minor players.  American is arguably the largest airline in the world and one of four airlines that collectively control around eighty percent of domestic air travel.  Id. at 73.  It is one of three "global network carriers" ("GNCs") operating in the U.S. today -- each GNC (American, Delta Air Lines, and United Airlines)

"possess[es] [a] broad network[]" of hub-and-spoke operations to reach a "wide range of origins and destinations . . . either directly or through connecting itineraries." Id. at 76. American's domestic hubs as of 2019 included Charlotte, Chicago, Dallas/Fort Worth, Los Angeles, Miami, New York City, Philadelphia, Phoenix, and Washington, D.C. Id. at 80.

Meanwhile, JetBlue is the sixth largest airline in the U.S. Id. at 73. It is younger than American and has historically operated with a reputation as a "disruptor" that aggressively competes with older legacy carriers, with documented procompetitive effects. Id. at 79–80. Given its evolution and pursuit of growth, JetBlue now falls within a category of hybrid carriers that are neither GNCs nor "low-cost carriers" ("LCCs"), i.e., those that generally rely on "point-to-point flying using a single type of aircraft . . . [and] class of service." Id. at 76, 79. Like LCCs, JetBlue maintains a lower cost structure and generally provides lower fares, although its cost structure has become more complex in recent years. Id. at 79, 102. But it also operates what could be considered a regional hub-and-spoke network out of the Northeast, with six "focus cities" as of 2019: New York City (its headquarters), Boston, Fort Lauderdale, Orlando, Los Angeles, and San Juan. Id. at 79. Around seventy-five percent of

JetBlue's routes fly in or out of New York or Boston, its two largest focus cities. Id.

Through June 2020, American and JetBlue competed with each other across all markets both airlines served. Id. at 80. In the Northeast, American and JetBlue were leading competitors -- they were two of the four largest carriers operating in New York, and two of the largest three in Boston. Id. at 73. In Boston, JetBlue and the three GNCs controlled more than eighty percent of the domestic air travel market in 2019, whereas in New York the four carriers' combined market share exceeded seventy percent. Id. at 78. In this northeast region, American and JetBlue competed to provide nonstop service on twenty-nine routes to and from New York and Boston, with significant market shares on many of those routes. Because "strategic fare and schedule changes are the subject of continual analysis and discussion," id. at 77, competitors like American and JetBlue generally reacted to any fare or schedule change by the other carrier in the same market, id. at 77, 80.

Within this competitive environment, there are various constraints on a carrier's ability to operate at a particular airport and expand the routes it may offer. One such constraint is access to gates, which are limited in number and sometimes fully allocated among existing carriers at any given time. Id. at 78

n.10.  As such, a carrier looking to initiate or expand service
needs to secure access to the requisite gates.  Id. at 78.  At
certain heavily congested airports, like JFK and LaGuardia ("LGA")
in New York, carriers must also secure access to slots, which
refers to authorization from the Federal Aviation Administration
("FAA") to take off or land in a particular time slot.  Id.  Both
gates and slots are "scarce, valuable, and sought-after
resources."  Id.

      In terms of domestic cooperation among airlines,
carriers in the United States historically have only engaged in
small-scale arrangements, unlike the extensive cooperation between
GNCs and various international carriers to expand service to
outlying destinations through commingled itineraries.  See id. at
80-81.  Domestically, cooperative arrangements have included
interline agreements, where if one carrier promises to rebook its
passengers after a cancelled flight, it may do so using its
partner's flights in addition to its own.  Id. at 81.  Carriers
have also engaged in code-sharing, where a carrier allows customers
of another carrier to purchase seats on a particular flight via
either carrier's website.  Id.

      In 2019, American started to develop a "new domestic
strategy" that involved strengthening its partnerships with other
carriers to address its apparent weaknesses on both the West and

East Coast.  Id.  On the West Coast, this strategy culminated in
February 2020 with the announcement of the West Coast
International Alliance ("WCIA") between American and Alaska
Airlines.  Id.  The WCIA made Alaska a member of American's
"oneworld alliance" with international carriers, continued the two
carriers' code-sharing partnership, and established "capped and
non-reciprocal revenue sharing" between certain complementary
markets.  Id. at 81-82 (emphasis omitted).  Importantly, the WCIA
did not include any coordination between the carriers regarding
capacity, scheduling, network planning, or market allocation on
direct overlapping routes.  Id. at 82.  Indeed, the two carriers
were effectively not direct competitors prior to the WCIA, which
instead was meant to leverage their complementary networks.  Id.
The WCIA, which American described as a success, is still in effect
today.  Id.

On the East Coast, American's new domestic strategy
played out differently.  In New York, American was worried about
United and Delta's growth, and perceived its own operations as
insufficiently profitable even though -- as of 2019 -- it
maintained the second-most slots at LGA and the third-most at JFK.
Id. at 83.  Additionally, American perceived that some of its slots
at JFK were "under heavy scrutiny" by the FAA for underuse and
were therefore at risk.  Id.  Meanwhile, JetBlue had concerns of

its own.  Its growth in New York had tapered due to its inability to obtain more slots at JFK or LGA.  Id.  And by 2020, it was worried about Delta's investment in growth in Boston as a threat to its dominance at Logan.  Id.

As a result, talks began in late 2019 between American and JetBlue regarding a possible lease of some of American's underused slots at JFK.  Id.  But negotiations, which continued through the start of the Covid-19 pandemic, soon expanded to contemplate a broader WCIA-style alliance in the Northeast.  Of primary concern to both carriers was the hope of addressing the perceived competitive threat that Delta posed in key markets in the region.  Id.  As part of the negotiations, the carriers produced a hypothetical joint network schedule for 2023 that pooled and "optimized" their resources, including expected aircraft fleets, to evaluate what a partnership could achieve in terms of estimated passenger traffic and revenue.  Id. at 84.

On July 15, 2020, American and JetBlue announced the result of their partnership: the Northeast Alliance ("NEA").  Id. Established through a set of contracts, the NEA included "codesharing, schedule coordination, revenue sharing, reciprocal loyalty benefits, and joint corporate customer benefits."  Id. Both carriers' short-haul services, as well as American's

- 8 -

long-haul services touching Logan, JFK, LGA, and Newark ("the NEA airports"), were included.  Id.

One of the NEA's core features is "the optimization of American's and JetBlue's route networks and scheduling of flight times and frequencies at the NEA [a]irports." Id. at 85 (quotation marks omitted).  Though the agreement states that each carrier will continue to operate independently as to pricing, capacity, and network management decisions, the NEA's process of creating a joint schedule "necessarily involves cooperation . . . regarding capacity allocation" decisions, both generally and with respect to individual routes.  Id.  To that end, the NEA provides for the carriers to pool airport infrastructure, including slots and gates.  Id.

As for revenue sharing, American and JetBlue's stated goal is to align the parties' incentives and achieve "metal neutrality," meaning an indifference as to whether a passenger within the NEA region flies on a JetBlue or American plane.  Id. The carriers' contract sets out a complex process to split their revenue pool annually, where each carrier receives a base amount of passenger-related revenue based on their respective performance during the most recent year, after which the carriers divide the remaining incremental revenue in the pool based on each carrier's proportion of total NEA capacity for that year.  Id. at 85—86.

The actual mechanics of the revenue-sharing process involve one carrier making an annual "transfer payment" of excess revenue due to the other under the terms of the agreement. Id. at 86.

The NEA, by its terms, lasts for at least seven years and would continue indefinitely absent affirmative efforts by either party to terminate. Id. at 87. As amended, the NEA limits each airline's ability to transfer or sell any slots at JFK or LGA to other third-party carriers. Id. It also includes promises made as part of the carriers' commitments to the U.S. Department of Transportation ("DOT") in connection with that agency's regulatory review of the NEA. Id. Those include, among other things, a promise by JetBlue not to exit certain JFK routes it served prior to the Covid-19 pandemic, and an agreement to divest certain slots at JFK if certain growth requirements are not met. Id. at 87-88. Additionally, the parties amended the NEA to remove revenue sharing on six carve-out routes (all of which ended at Logan) on which American and JetBlue had a particularly high market share. Id. at 88.

**B.**

On September 21, 2021, DOJ, along with several states, filed suit to enjoin American and JetBlue from further implementing

the NEA.[1]  Plaintiffs alleged that the NEA violated section one of
the    Sherman    Act,    which    prohibits    "contract[s],
combination[s] . . ., or conspirac[ies], in restraint of trade or
commerce."  15 U.S.C. § 1.

In September 2022, the case proceeded to a monthlong
bench trial.  As the district court noted, the trial featured
"testimony by two dozen witnesses, most of whom were either
executives of the defendants or experts paid for their testimony
by one side or the other[,] . . . augmented by more than 2,700
pages of excerpts from the depositions of seventeen additional
witnesses."  Am. Airlines Grp., 675 F. Supp. 3d at 74.  "More than
a    thousand    exhibits    were    admitted    into    evidence,"    and
"[p]ost-trial written submissions by the parties exceeded six
hundred pages."  Id.

In relevant part, six expert witnesses testified -- two
for plaintiffs, four for defendants.  Id. at 100—01.  Put bluntly,
the district court did not react favorably to defendants' experts.
It rejected "entirely" the opinions and conclusions of three of
defendants' four experts for two main reasons.  Id. at 104.  First,
the court found them biased.  Id. at 101.  Each had extensively
(and largely uniformly) defended GNCs in past antitrust

---

[1]  By the time of trial, the NEA was approximately
eighty-percent implemented.  See Am. Airlines Grp., 675 F. Supp.
3d at 89.

litigation.  Id.  They also each acted and spoke like advocates invested in obtaining a ruling for the airlines.  Id.  And the court found their testimony itself generally not credible, concluding that much of it rested on faulty assumptions.  Id. at 101—04.

### C.

On May 19, 2023, the district court issued its findings of fact and conclusions of law.  As to its factual findings, the district court specifically identified seven key effects resulting from the NEA.

First, the district court found that American and JetBlue no longer competed within the scope of the NEA.  Id. at 89.  More specifically, the NEA's schedule-coordinating provisions caused the carriers to act as one airline in the NEA region "when choosing which routes to fly, when to fly them, and which aircraft (and which partner) will do so."  Id.  The NEA's revenue-sharing provisions were also designed to render the carriers indifferent as to which carrier a customer uses within the NEA region.  Id.

Second, the district court found that the NEA caused both carriers to adjust their network priorities, with both focusing more on growing in New York at the expense -- because of fleet-size constraints -- of "some pre-NEA plans to devote resources to growth elsewhere."  Id. at 90.  To that end, the court

rejected as factually unsupported the claim that the NEA caused the carriers to expand (or at least delay shrinking) their fleets. Id. at 91 n.44.

Third, the court found that after the NEA was announced, American's slots at JFK and LGA were used "more heavily and efficiently." Id. at 92. However, the court found that this occurred in part because American had leased certain slots to JetBlue (which may have been likely without the NEA) as well as "upgauged" some of its aircraft and added some routes at those slots. Id. And the court found no plausible explanation for why those changes could not have occurred without the NEA. See id.

Fourth, the court found that the NEA led to "decreased capacity, lower frequencies, or reduced consumer choice on multiple routes, including some that are heavily traveled." Id. For one, American and JetBlue allocated certain routes to one or the other carrier in at least thirteen markets touching LGA (including Boston-LGA, from which American exited), which reduced the total frequencies or capacity in certain NEA markets.[2] Id. at 92-93. The court also noted that the evidence suggested that defendants would "continue to allocate more markets between them." Id. at 93. Additionally, the court found that even on the routes

---

[2] American debates the factual underpinnings of this finding, which we discuss infra.

that both carriers continued to serve, defendants ceased competing on "wing tip[]" flights, meaning flights departing at the same time of day.  Id. at 93 & n.45.

Fifth, the court found that the NEA's reciprocity and code-sharing features caused frequent fliers and many corporate clients to gain broader access to benefits and discounts.  Id. at 93.  However, the court noted that such travelers accounted for a relatively small percentage of American's customers.  Id. at 93—94.

Sixth, the court found that the NEA raised JetBlue's operating costs and deprived the airline of two significant opportunities to expand its collection of slots and approvals, undermining the carrier's role as a maverick "disruptor" in the market.  Id. at 94-95, 79.  More specifically, JetBlue lost out on more favorable slots at London's Heathrow Airport because of the NEA and similarly lost slots for which it had bid at Newark based on DOT's findings about the NEA's likely effects on JetBlue's market position.  Id. at 95 & n.52.

Seventh and finally, the court found that the NEA's "spirit of partnership" had already led American and JetBlue to disregard the NEA's safeguards.  Id. at 96.  Specifically, pursuant to the terms of the NEA's revenue-sharing provisions, at the end of 2021, JetBlue owed American a "transfer payment" of over

- 14 -

$200 million.  Id.  However, American forgave most of that amount and instead agreed to accept a transfer payment of $27 million. Id.  And even after disregarding the NEA's express requirements, the carriers declined to amend the contracts accordingly -- a decision the district court found to undermine the carriers' claims that other provisions in the NEA would have guaranteed that they adhered to certain procompetitive conduct or prevent anticompetitive effects.  Id. at 96-97.

**D.**

Based on its factual findings, the district court proceeded to assess the lawfulness of the NEA.  Courts have construed the Sherman Act to preclude only those contracts that "unreasonably restrain competition."  N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5 (1958).  "A small group of restraints are unreasonable per se because they 'always or almost always tend to restrict competition and decrease output.'"  Ohio v. Am. Express Co. (Amex), 585 U.S 529, 540 (2018) (quoting Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 723 (1988)).  Otherwise, "[d]etermining whether a restraint is undue for purposes of the Sherman Act 'presumptively' calls for what [courts] have described as a 'rule of reason analysis.'"  NCAA v. Alston, 594 U.S. 69, 81 (2021) (quoting Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006)).

A rule-of-reason analysis requires a fact-specific assessment of the restraint's actual effect on competition. Amex, 585 U.S. at 541. Under the rule of reason's three-step burden-shifting framework, the plaintiff must first make a showing that the restraint has a substantial anticompetitive effect, which can be proven directly or indirectly. Id. at 541—42. If the plaintiff carries that burden, the burden shifts to the defendant to show a "procompetitive rationale for the restraint." Id. at 541. And "[i]f the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means," id. at 542, or that on balance, the restraint's harms outweigh its benefits, see Sullivan v. Nat'l Football League, 34 F.3d 1091, 1111 (1st Cir. 1994).

In applying the rule of reason, the district court found that plaintiffs met their burden of showing that the NEA had direct anticompetitive effects in three ways. Most significantly, the district court found that the NEA "led to decreased capacity, lower frequencies, or reduced customer choices on multiple routes . . . ." Am. Airlines Grp., 675 F. Supp. 3d at 92. As to what drove that reduction in output, the district court made three further findings. First, the court found that JetBlue and American no longer directly competed with each other within the NEA region,

- 16 -

reducing market participants in the already extremely consolidated region by one.  Second, by aligning its interests with American, JetBlue sacrificed some of its independence and status as an important maverick competitor in the industry.  And third, the NEA's feature of schedule/route "optimization" (including assigning routes to either American or JetBlue) closely resembled per se illegal market allocation.[3]  See Am. Airlines Grp., 675 F. Supp. 3d at 113–17.

Next, the court found that American and JetBlue failed to carry their burden to show a procompetitive rationale for the NEA's anticompetitive restraints, because their asserted justifications either were not legally cognizable or lacked evidentiary support.  Id. at 120–26.  It also found that the NEA was not an otherwise lawful joint venture with restraints merely ancillary to its overarching procompetitive purpose, such as pooling complementary resources to develop a new service.  Id. at 122.  Rather, the NEA's anticompetitive features were "at its core."  Id. at 123.  For example, the court found that the primary reason for the NEA was to strengthen defendants' competitive position at the expense of Delta (and United) -- rather than

---

[3]  The district court also found that plaintiffs alternatively satisfied their burden at step one of the rule of reason by showing that the NEA had anticompetitive effects through indirect evidence.  Am. Airlines Grp., 675 F. Supp. 3d at 117–19.

maximizing "customer value."  Id. at 120—21.  As to the remainder of defendants' asserted benefits, that evidence supported at most only one arguable benefit -- more flexible loyalty benefits. Assuming that flexibility to be procompetitive, the district court nevertheless found it "de minimis compared to the anticompetitive harms the court has found . . . ."  Id. at 124, 126.

The district court closed with step three.  It found that the NEA's ostensible procompetitive benefits could have been achieved through less restrictive alternatives -- namely, an agreement like the WCIA between American and Alaska Airlines -- and that, on balance, the NEA's harms outweighed any cognizable benefits.  Id. at 126—28.

In light of its findings, the district court enjoined American and JetBlue from continuing or further implementing the NEA.  Id. at 128.  The court's injunction ordered them to cease all coordination of schedules, routes, or any effort to allocate markets.  It also prohibited the carriers from entering into any arrangement substantially similar to the NEA.  To that end, the injunction required that defendants provide notice to plaintiffs prior to entering into any such arrangement.

Shortly after the injunction entered, JetBlue exited the NEA pursuant to its terms of cancellation.  American, the only remaining defendant, appealed.[4]

## II.

We review the district court's conclusions of law de novo and its factual findings for clear error.  Calandro v. Sedgwick Claims Mgmt. Servs. Inc., 919 F.3d 26, 33 (1st Cir. 2019). The district court's findings of fact must be honored unless, "after careful evaluation of the evidence, we are left with an abiding conviction that those determinations and findings are simply wrong."  State Police Ass'n of Mass. v. Comm'r of Internal Revenue, 125 F.3d 1, 5 (1st Cir. 1997); Fed. R. Civ. P. 52(a)(6).

On appeal, American nowhere expressly argues that any of the district court's factual findings were clearly erroneous.

---

[4] Even though the NEA is no longer in effect, American requests that we vacate the district court's permanent injunction prohibiting it from pursuing similar arrangements in the future, as well as subjecting it to a notice requirement prior to entering into any such arrangement.  American also indicated at oral argument that it intends to enter into another NEA-like arrangement if we grant its requested relief.  For all of these reasons collectively, American's appeal is not moot.  See Auto Parts Mfg. Miss., Inc. v. King Constr. of Houston, L.L.C., 782 F.3d 186, 192 (5th Cir. 2015) ("Because appellants request vacatur of the permanent injunction, there is still a live issue before this court, and the challenge to the district court's injunctive relief is not moot."); cf. Town of Portsmouth v. Lewis, 813 F.3d 54, 58 (1st Cir. 2016) ("[A] case is moot when the court cannot give effectual relief to the potentially prevailing party." (citation omitted)).

Instead, American trains its attention on the district court's rule-of-reason analysis, arguing that legal error befell it each step of the way.  We treat each of American's arguments in turn.

### A.

American first takes issue with the mode of analysis the district court employed to assess the NEA's lawfulness under the Sherman Act.  Specifically, American argues that the district court erroneously subjected the NEA to "quick look" condemnation rather than applying a full-blown rule-of-reason analysis.  It suggests that joint ventures like the NEA are "not usually unlawful," Broad. Music, Inc. v. Columbia Broad. Sys. Inc., 441 U.S. 1, 23 (1979), even though they inherently stifle competition between the two venturing firms.  Thus, it argues that the district court's ostensibly cursory dismissal of the NEA warrants reversal.

American's argument is unavailing on multiple levels.  For one, that the NEA is a "joint venture" says little about the level of antitrust scrutiny it should receive.  After all, one could describe price fixing as a joint venture.  Our inquiry therefore trains not on American's label, but rather on the terms and effects of the parties' agreement.  Here, the district court found as fact that this venture reduced output while garnering no competitive benefits that could not otherwise be achieved -- which American does not claim to be clearly wrong.  The label of "joint

venture" does not itself change the analysis, which is "aimed at substance rather than form." Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 760 (1984). And while it is fair to say that "most joint venture restrictions" are subject to the rule of reason, the level of scrutiny required under that standard exists along a "competitive spectrum." Alston, 594 U.S. at 88; see also Dagher, 547 U.S. at 7 (rejecting per se treatment of a joint venture). The rule of reason is merely a "fact-specific assessment," Amex, 585 U.S. at 541, that varies based on "the circumstances, details, and logic of a restraint," Cal. Dental Ass'n v. FTC, 526 U.S. 756, 781 (1999). Indeed, the leading treatise notes that "[t]he rule of reason is often erroneously assumed to require detailed fact finding and balancing" -- instead, the rule is better viewed as creating a "sliding scale" of antitrust analysis with many variations in proof that depend on context. 11 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 1508 (4th ed. 2022) [hereinafter Areeda & Hovenkamp].

Moreover, the district court did not condemn the NEA with as quick a look as American suggests. Although the district court formally found that the NEA merited a less "deep and searching analysis," Am. Airlines Grp., 675 F. Supp. 3d at 112, it nonetheless made extensive and reasoned findings regarding the

- 21 -

NEA's effects on competition after conducting a monthlong bench trial and reviewing a mountainous record. Under these circumstances, we decline to classify the district court's herculean efforts in analyzing the NEA as a mere "quick look." Rather, tailoring its examination to the specific transaction at issue, the court received evidence and made findings sufficient for a confident and reliable assessment of the actual and likely effects of the NEA's adoption.

## B.

American argues that the district court erred in finding that plaintiffs met their initial burden of proving that the NEA had substantial anticompetitive effects. First, American says the only way to prove actual anticompetitive harm to consumers in the relevant market is with empirical evidence "that tends to prove that output was restricted or prices were above a competitive level." Amex, 585 U.S. at 549 (quoting Brook Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 237 (1993)). But whether there are other available routes to show anticompetitive harm matters not at all in this case because the district court expressly found output reduced.

In an attempt to challenge that finding without claiming clear error, American argues that the district court unlawfully treated the NEA's empirical effects on output and price as

immaterial.  Here, we disagree.  The court expressly found that the NEA "led to decreased capacity, lower frequencies, or reduced consumer choices on multiple routes, including some that are heavily traveled."  Am. Airlines Grp., 675 F. Supp. 3d at 92. American makes no showing that these findings are clear error. More specifically, the district court found that in at least thirteen markets that American and JetBlue both previously served, the NEA allocated the route to one carrier and caused the other to exit, and that the evidence suggested that the carriers would continue to allocate more markets between them.  Id. at 92-93. And in markets the carriers both continued to serve, the court found that the NEA caused American and JetBlue to cease directly competing on "wing tip[]" flights in those markets.  Id. at 93. The district court even found that the NEA's "spirit of partnership" undermined any claim that the carriers would continue to compete on the routes the NEA "carve[d][]out" from its joint schedule.  Id. at 97.  Based on these findings, the district court concluded that the NEA in fact "reduced total frequencies or capacity in certain NEA markets."  Id. at 93.[5]  Consequently, even

---

[5]  For the first time on reply, American argues that with respect to two heavily traveled routes in which one carrier exited -- Boston-LGA and Boston-DCA -- total capacity as measured by seats increased.  However, American's only support for this claim is an exhibit that is not in the trial record.  Moreover, the evidence itself is raw data from which American now offers an extrapolation on appeal.  We decline to entertain this evidence

assuming arguendo that a showing of reduced capacity was required to find anticompetitive harm, the district court made the requisite findings here.

Without attempting to show that the district court committed clear error in its output-related factual findings to the contrary, American argues that the NEA actually resulted in increased capacity in the form of "more flights, more seats, more routes, shorter connections, better frequent flyer benefits, and more choices." But the district court expressly rejected as unreliable the evidence American offers in support of these claims. Indeed, with respect to American's assertions regarding the NEA's effects on capacity, the district court noted that "[n]o objective or helpful corroboration is provided by citations to defendants' own internal slide decks pitching the benefits or success of the NEA without providing reliable sources or support for the claims contained therein." Id. at 125. Yet American now cites the same slide deck on appeal in support of the NEA's purported success, as if the district court simply never made this finding.

American also claims that the NEA's capacity-expanding effects were undisputed. But the district court expressly declined to attribute various capacity increases to the NEA itself. See

---

and argument for the first time on appeal, particularly after a bench trial. See United States v. Zannino, 895 F.2d 1, 9 n.7 (1st Cir. 1990).

id. at 92.  While the district court did find that the NEA caused the carriers to "adjust their overall network priorities" to focus more on growth in New York, it also found that such growth came "at the expense of resources and output by the defendants elsewhere."  Id. at 90, 124.  The district court expressly found no evidentiary support for the claim that the NEA led either carrier to increase its fleet rather than reallocate it.  See id. at 91 n.44, 124–25.  Additionally, while the district court acknowledged that since the NEA was announced, "American's slots at JFK and LGA have been used more heavily and efficiently," it did not attribute this growth to the NEA because American intended to lease underutilized slots to JetBlue even prior to the NEA. Id. at 92.  And more broadly, the mere fact that airline capacity overall increased between 2021 and 2022 -- just as the industry began to recover from the Covid-19 pandemic -- did little to show that the NEA itself increased American or JetBlue's capacity in any meaningful way.[6]

---

[6] To that end, American's claim that plaintiffs' experts conceded at trial that the NEA did not cause any actual consumer harm also fails.  For example, plaintiffs' expert Dr. Town simply testified that it would be difficult to assess whether the NEA caused actual consumer harm given the circumstances of the pandemic recovery.  Additionally, Dr. Miller's testimony that his model did not use actual NEA schedules as inputs to observe post-NEA price or output effects did not amount to an admission that the NEA did not or would not cause any anticompetitive harm.  Rather, the district court found that Dr. Miller "explained why he chose the models he used to assess [the NEA's] effects," and, in any event,

American also contends that the district court erred in concluding that the NEA had direct anticompetitive effects in the form of market allocation and reduced consumer choice.  American argues that each of the various anticompetitive effects the district court identified are all versions of the same point: that the NEA was anticompetitive because "American and JetBlue collaborated and were no longer fully independent competitors." In turn, it argues that the court could only reach such a conclusion by relying on outdated case law that it says viewed "the protection of rivalry," as opposed to consumer welfare, as the best means of promoting competition.  However, American misconstrues the district court's findings, which were legally sufficient.

For one, as we have already noted, horizontal agreements allocating markets between substantial competitors have generally been treated as per se illegal.  See Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57, 61 (1st Cir. 2004) ("The most important per se categories are naked horizontal price-fixing, market allocation, and output restrictions."); see

---

only credited Dr. Miller's analysis to the extent it suggested that the NEA would create upward pricing pressure.  Am. Airlines Grp., 675 F. Supp. 3d at 100.  Moreover, the district court ultimately found that it was defendants who failed to show that new routes launched after the NEA did not instead "ar[i]se from the substantial shift in flying patterns occurring during and after the pandemic."  Id. at 125.

also Palmer, 498 U.S. at 49 ("[A]greements between competitors to allocate territories to minimize competition are illegal."). Granted, where a restraint like market allocation is "ancillary" to an otherwise procompetitive joint venture, per se condemnation of the agreement may not be warranted. See, e.g., Broad. Music, Inc., 441 U.S. at 23 (noting that joint ventures are not usually unlawful as price fixing where an "agreement on price is necessary to market the product at all"). But here, the district court found -- and American does not dispute -- that JetBlue and American's agreement to "optimiz[e]" their route schedules and thereby allocate markets within the NEA region was central, not ancillary, to the NEA.[7] Am. Airlines Grp., 675 F. Supp. 3d at 122—23. Thus, the district court's finding that the NEA's market allocation resides near the anticompetitive end of the spectrum rests on stable footing.

None of this is to say that the district court found the NEA per se unlawful. It did not. It is to say, rather, that the similarity between the NEA and naked market allocation further

_____

[7] For this reason, American's challenge to the district court's reliance on cases like United States v. Topco Associates, Inc., 405 U.S. 596, 608 (1972), which applied this per se rule to condemn a horizontal territorial-division agreement among competing grocery chains, is irrelevant. See Areeda & Hovenkamp ¶ 1511(d)(3)(A) (critiquing Topco on the grounds that the Court should have found the restraint at issue ancillary rather than per se illegal, but also noting that the Supreme Court continues to cite Topco with apparent approval, albeit in dicta).

buttresses the district court's already well-supported conclusion that, by reducing output without producing procompetitive benefits that were not otherwise achievable, the NEA failed to survive a rule-of-reason analysis.[8]

## C.

Having failed to undo the district court's conclusions at step one, American turns its sights to steps two and three of the rule-of-reason analysis. The district court found that the only colorable "procompetitive rationale" for the NEA's restraints established by American and JetBlue was more flexible loyalty benefits. Alston, 594 U.S. at 96; Am. Airlines Grp., 675 F. Supp. 3d at 120, 124, 126. On appeal, American argues that the district court improperly failed to countenance the rest of the NEA's ostensible procompetitive benefits as a matter of law and nullified step two in so doing. Specifically, it argues that the district court's rejection of its asserted benefits was not based on "any relevant fact-finding," but rather on the flawed legal conclusion that the carriers' asserted benefits only arose out of the

---

[8] Given these conclusions, we need not reach the issue of whether the NEA's reduction in the number of competitors itself, or its effects on JetBlue's "maverick" status, constituted standalone anticompetitive harms. Nor must we address American's challenges to the district court's alternative step-one finding that plaintiffs established actual competitive harms indirectly based on American and JetBlue's "market power." Am. Airlines Grp., 675 F. Supp. 3d at 118—19, 118 n.88.

anticompetitive collaboration at the heart of the NEA.  Yet here too, American's argument fails.

First, despite American's argument to the contrary, some of its asserted procompetitive justifications are simply not cognizable.  For example, any defense of a restraint based on the notion that competition itself is "inefficient, unreasonable, or confusing" is insufficient as a matter of law.  <u>Viamedia, Inc.</u> v. <u>Comcast Corp.</u>, 951 F.3d 429, 479 (7th Cir. 2020); <u>see also</u> <u>Collaboration Guidelines</u> § 3.36(a) ("Some asserted efficiencies, such as those premised on the notion that competition itself is unreasonable, are insufficient as a matter of law.").  Indeed, the FTC and DOJ's Collaboration Guidelines reiterate this point, describing "cognizable efficiencies" in horizontal collaborations as those that "do not arise from anticompetitive reductions in output or service, and that cannot be achieved through practical, significantly less restrictive means."  <u>Collaboration Guidelines</u> § 3.36.  Additionally, it is well established that other defenses are unacceptable, including that "the defendants fixed prices or divided a market in order to ensure that weaker market participants would get a 'fair' share of the trade," or that -- as American itself tries to argue -- "elimination of competition along one avenue . . . will not affect consumers adversely because the

participants will continue to compete on price."   Areeda &
Hovenkamp ¶ 1907(b).

The Sherman Act "exist[s] to protect the competitive
process itself, not individual firms." Grappone, Inc. v. Subaru
of New Eng., Inc., 858 F.2d 792, 794 (1st Cir. 1988) (Breyer, J.).
As such, the notion that the "presence of a strong competitor
justifies a horizontal [anticompetitive] conspiracy" is certainly
not always the case. See United States v. Apple, Inc., 791 F.3d
290, 298 (2d Cir. 2015) (finding that Apple's desire to compete
with Amazon in the e-reader market did not vindicate its
price-fixing conspiracy with publishers).   The district court
rejected on factual grounds the notion that American and JetBlue
were "two small companies" seeking to collaborate so that they
could "compete more effectively with larger corporations
dominating the relevant market." Am. Airlines Grp., 675 F. Supp.
3d at 121 n.95 (quoting Brown Shoe Co. v. United States, 370 U.S.
294, 319 (1962)).   American does not directly challenge this
finding on appeal.   So, we see no error in the district court's
rejection of American's argument that the NEA generated a
procompetitive benefit for the purposes of step two in the sense
that it better allowed the carriers to compete with Delta -- the
NEA's principal purpose. Id. at 121—22.   Indeed, "a party can[not]
relabel a restraint as a product feature and declare it 'immune

- 30 -

from § 1 scrutiny.'" Alston, 594 U.S. at 101 (quoting Am. Needle, Inc. v. Nat'l Football League, 560 U.S. 183, 199 n.7 (2010)).  To the extent that is what American seeks to do here, the effort is mistaken.  The NEA may well have benefited American and JetBlue, but to prevail at step two the carriers had to focus on the effects on consumers and "the competitive process" itself.  See Grappone, Inc., 858 F.2d at 794; cf. Viamedia, 951 F.3d at 479 ("[C]laimed benefits from [challenged] conduct must be procompetitive and not simply the result of eliminating competition.").

Moreover, American otherwise fails to show that the district court clearly erred in rejecting defendants' remaining asserted procompetitive justifications as factually unsupported. For one, American nowhere lodges a challenge to the district court's finding that the NEA was not necessary "to create a new product or market that could not otherwise exist," or that American and JetBlue's pooled assets were not "complementary" in a way that would -- with collaboration -- enable them to innovate in a way neither could alone.[9]  Am. Airlines Grp., 675 F. Supp. 3d at 122—

---

[9]  American does not meaningfully dispute the district court's finding that the NEA in no way revolutionized the "product" American and JetBlue provide: flights from one place to another. Am. Airlines Grp., 675 F. Supp. 3d at 122 n.97.  Nor does American dispute the district court's rejection of the claim that the NEA actually resulted in "better schedules" from a customer standpoint, given its elimination of wingtip flight competition. Id. at 123.

23.  Nor does American claim as clear error the district court's finding that, even taking the carriers' asserted benefit of increased competition with Delta on its own terms, the evidence of any competitive response to the NEA by Delta (or United) was "milquetoast, at best" and was "in line with [Delta's] typical responses to any moves by any competitors, included changes that were already part of the carrier's plans, and reflected general recovery trends in New York in the wake of the pandemic."  Id. at 124 & n.101.  Indeed, rather than confront the sufficiency of these findings head on, American instead paints the district court's step-two findings as "not rooted in any relevant fact-finding" at all.  We are unpersuaded.

Perhaps most critically, American all but abandons any serious attempt to dispute the district court's conclusion that the rest of its claimed benefits "lack evidentiary support entirely or find support only if an artificially narrow lens is applied."  Id. at 124.  As we explained supra at Section II.B, American's perfunctory claims regarding the NEA's purported effects on capacity and output wither under even the slightest scrutiny.  For example, American boasts -- as if uncontroverted -- that the NEA's efficiency gains caused the carriers to increase their capacity at NEA airports by "more than 200%" in the form of "nearly 50 new nonstop routes, increased frequencies on more than 130 routes,

[and] increased capacity on 45 New York City flights." For support, American cites only to trial exhibits consisting of defendants' own internal slide decks and charts reiterating these very claims, bereft of any primary source support. The district court found this very evidence to provide "no objective or helpful corroboration" of the carriers' claims regarding the NEA's successes. Id. at 125-26, 126 n.109 (noting that by the time of trial, the carriers distanced themselves from various internal documents, likely realizing their evidentiary flaws). And American now offers no dispositive counterpoint to the district court's finding that, even with respect to discrete new routes launched within the NEA region, the carriers failed to show that American or JetBlue added any such routes "because of" the NEA itself. Id. at 125.

Nor does American undercut the district court's finding that the carriers' claims of capacity growth disregarded evidence that growth within the NEA came "at the expense of resources and output by the defendants elsewhere, as well as evidence the defendants each would have pursued at least some of this growth with or without the [NEA.]" Id. at 124. American suggests that it was error for the district court to consider "out-of-market effects" or what would (or would not) have occurred but for the NEA at step two of the rule of reason, rather than simply take

American's asserted procompetitive benefits on their own terms.
Not so.  These considerations -- both contextualizing defendants'
asserted capacity effects and considering the carriers' pre-NEA
incentives -- properly figured into the court's ultimate analysis
of whether any such asserted benefits actually flowed from the
NEA.

Finally, American asserts that the district court's
step-three analysis was corrupted by its failure to credit its
arguments about procompetitive benefits.  In doing so, American
ignores the district court's conclusion that the procompetitive
benefit achieved by the NEA -- more flexible loyalty
benefits -- could "plainly [be achieved] through less restrictive
means."  Am. Airlines Grp., 675 F. Supp. 3d at 126 n.112.  Indeed,
the district court explained that a "more limited WCIA-style
arrangement" complete with "some degree of codesharing and loyalty
reciprocity," similar to the agreement between American and Alaska
Airlines on the West Coast, would have sufficed.  Id. at 127.  This
finding is undisturbed on appeal.[10]

_____

[10]  As the Supreme Court has noted, "however framed and at
whichever step, anticompetitive restraints of trade may wind up
flunking the rule of reason to the extent the evidence shows that
substantially less restrictive means exist to achieve any proven
procompetitive benefits."  Alston, 594 U.S. at 100; see also Areeda
& Hovenkamp ¶ 1505 (noting that steps two and three "can be
collapsed into one," in part because a "legitimate objective that
is not promoted by the challenged restraint can be equally served

All in all, American fails to convince us that the district court committed clear factual errors or an error of law in finding that the carriers did not carry their burden to "justify the [NEA's] restraints with evidence of procompetitive benefits." Am. Airlines Grp., 675 F. Supp. 3d at 110 (citing NCAA v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 113 (1984)).[11]

**III.**

Presented with an arrangement that had many of the essential attributes of an agreement between two powerful competitors sharing revenues and divvying up highly concentrated markets, the district court conducted a monthlong proceeding, after which it made detailed findings of fact, many key ones of which were unfavorable to American. Seeing no clear error in those findings, we also see no error of law in the court's application of the rule of reason to conclude that the arrangement violated section one of the Sherman Act.

For the foregoing reasons, the judgment of the district court is affirmed.

---

by simply abandoning the restraint, which is surely a less restrictive alternative").

[11] Additionally, we have otherwise considered American's remaining arguments and find them to be without merit.

- 35 -